

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-3-1999

# Voilas v. General Motors Corp

Precedential or Non-Precedential:

Docket 98-5057

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Voilas v. General Motors Corp" (1999). *1999 Decisions*. Paper 55.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/55

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 3, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-5057

GEORGE H. VOILAS; JOHN TRIPPA; WALT WENSKI;
MARIETTA BERENATO; JOHNNY M. DOLLSON; AUGUSTA
BUDD, INDIVIDUALLY AND ON BEHALF OF ALL OTHER
PERSONS SIMILARLY SITUATED; LOTTIE FERGUSON;
JOHN MELLODGE; SILVIA ALBARRAN; ROBERT L.
ALDRIDGE; CARMEN C. ALICEA; BEATRICE P. AMISON;
GERALD P. AMISON; SHIRLEY ANDERSON; JOSEPH R.
ANDREWS, JR.; MARY LOU ARCAMONE; MARY B.
AUSTIN; SAMUEL A. BADESSA; JAMES BAILEY;
RAYMOND BAYZATH; JOSE BEAUCHAMPS; MARY L.
BENJAMIN; GEORGE R. BERES; JOZEFA BIELSKI;
LEON R. BOYER; RICHARD M. BRACY; WILLIAM F.
BRADY, JR.; RICHARD BRIGGS; FREDDIE L. BRIMLEY;
HERBERT BROOKER; JAMES BROPHY; JAMES BROWNE;
VICTORIA BROWN; HECTOR G. BURGOS; JOHN E.
BURRES; ADELYN BURROUGHS; ROBERT C. CASE;
MARGARET CHAMBUC; PATRICIA F. CHARYAK; ELMONT
CHEESMAN; VINCENT J. CHESNEY; MATTEO CIPRIANO;
BENJAMIN COLE; THOMAS J. COLEMAN; GLORIA M.
COLLAZO; FRED M. COMO; DAVID M. COPE, SR.;
MARIA T. COWELL; WILLIAM R. CRAFT; PATRICIA
CRAMMER; JOANN CREA; LUZ M. CRUZ; EDWARD R.
CULVER; MARY L. CZAP; SOPHIE DARDZINSKI;
DOLORES M. DEGENNARO; MYRTLE DELBAUGH;
BARBARA DERRY; MARGAREE DILLARD; EDWARD
DOROBA; ANTHONY DOTO; ANATOL DOWBNIA; THOMAS
DOW; DAVID DOWNING, JR.; CHARLES P. DRAGOS;
MARY F. EALY; KURT EDER; BETTY EDDY; CUSTODIA
FEIJO; SYLVIA FERGUSON; HELEN FIGG; ETHEL M.
FINROCK; JUAN FLORES; RAFAEL GARCIA; MAJORIE O.
GARVIN; GEORGE E. GINDHART; DELORES R.
GLAZEWSKI; LESTER GLASCOE; LARRY G. GOODMAN;
RICHARD P. GRIMES; ELFRIEDA HALKO;

MURRAY HALPERN; GERALDINE B. HAMBLEY;
KATHERINE HAMILTON; BARBARA A. HARDEN;
CHARLOTTE HAYDEN; WILLIAM S. HILL; THOMAS J.
HORAN; RICHARD M. HUTCHINSON, JR.; SARAH C.
INNIS; JOSEPH J. JANECZEK; WILLIAM JEFFERSON;
ANDRENA JOHNSON; JOHN D. JOLLY; KATHLEEN E.
JONES; DOROTHEA E. KATO; DOLORES J. KELLEY;
DOROTHY M. KELLY; MARGARET M. KENNEDY;
BELA H. KISS; CARL H. KUHFELDT; SAM M. LAGARES;
RONALD LAWRENCE; CHONG SUE LEE; ARMAND
LORETUCCI, JR.; JACQUELINE MARINELLO;
DOLORES L. BEERS (nee MARLIN); MARGARET MASON;
THOMAS MATTEI; JUAN MEDINA; MARY R. MEROVICH;
FILLIPPI P. MICOCCI; EUGENE MINICH; HECTOR M.
MORALES; MINERVA MORALES; CORNELIUS MORROW;
MARY A. MURPHY; EDWARD J. NEMETH; CARMELA C.
NICKELS; STANLEY J. OLSCHEWSKI; RONALD J.
PALMIERI; GERALDINE PARRISH; JAMES PETRUCELLI;
NICHOLAS PFANN; GERTRUDE PINKNEY; FREYA E.
POLIZIANA; ALFREDA PRASAK; ROCHELLE PRITCHARD;
CARMEN QUILES; FREDERICK RAINER; EVELYN
RAMSEY; RAYMOND R. RAWA; STANISLAW REMBOWSKI;
ASTON RICHARDSON; ROBERT ROBINSON; RICHARD J.
ROGALINSKI; SATURNINO ROMAN; OLGA RUTH;
ANDREW J. SAMU; MINNIE SANDERS; ANTHONY SCOTT;
ERNEST SCOTT; JASPER T. SCOTT; JOSEPHINE
SECKINGER; JOSEPH B. SEROCK; MARGARET
SHELTON; THOMAS SEHUNUK; FREDERICK O. SHIPP,
SR.; JANET A. SIMPSON; GLADYS A. SMALLEY;
ELIZABETH J. SMITH; FRANK SMITH; FRANK E. SMITH;
DOLORES STEWART; ROBERT A. STOCKER;
BARBARA A. SYKES; IDA TAYLOR; ANTHONY TESTA;
GILBERT J. TILTON; ISAAC TONEY; EMANUEL J.
TRAMONTANA; EVELYN TREIBLY; EMMA M. TWYMAN;
KATHERINE VANDERBILT; ELIZABETH O. VANDEWATER;
JAMES L. VANDEWATER; PATRICIA A. VELEZ;
ROBERT F. WALKER; MARIE A. WALSH; JOHN WALTER;
LORETTA WASHINGTON; JOHN WELLS; JAMES B.
WHEELER; GLADYS WILLIAMS; MARGARET M.
WILLIAMS; ROSE MARIE WINROW; GEORGE M.
WOODWARD, JR.; BONNIE L. WRIGHT; FRANK PRASAK;
BENJAMIN ISOM; MICHAEL SEBASTO; WALTER LOMAX;

JOHN BLACK; HUGH DANIELS; KARL DEIBLER; JAMES
DUNCAN; MINERVA MONTERO; ALICEA QUINONES;
FRANK TUCCILLO; ROSCOE WRIGHT; AND
HANK WEINMAN

v.

GENERAL MOTORS CORPORATION; INLAND FISHER
GUIDE PLANT, A DIVISION OF GENERAL MOTORS
CORPORATION; LOCAL #731 INTERNATIONAL UNION,
UNITED AUTOMOBILE AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS OF AMERICA; UNITED
AUTOMOBILE AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS OF AMERICA

   (D.C. Civil No. 95-487)

GEORGE VOILAS; JOHN TRIPPA; WALTER WENSKI;
MARIETTA BERENATO; JOHNNY M. DOLLSON; AUGUSTA
BUDD, individually and on behalf of all other persons
similarly situated

v.

LOCAL #731 INTERNATIONAL UNION, UNITED
AUTOMOBILE AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS OF AMERICA
UNITED AUTOMOBILE AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS OF AMERICA, a labor
organization

   (D.C. Civil No. 95-2960)

GENERAL MOTORS CORPORATION,

  Appellant

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Nos. 95-cv-00487 & 95-cv-02960)
(District Judge: Hon. Garrett E. Brown, Jr.)

Argued: October 29, 1998

Before: SLOVITER, GARTH and MAGILL,*
Circuit Judges

(Filed March 3, 1999)

James J. Crowley, Jr. (Argued)
Linda B. Celauro
Kathryn A. Korger
Carpenter, Bennett & Morrissey
Newark, N.J. 07102

    Attorneys for Appellant

H. Thomas Hunt, III (Argued)
Anthony L. Marchetti, Jr.
Hunt & Scaramella, P.C.
Cherry Hill, N.J. 08002

Jerald R. Cureton
Michael J. Wietrzychowski
Cureton, Caplan & Clark, P.C.
Mt. Laurel, N.J. 08054

    Attorneys for Appellees

OPINION OF THE COURT

SLOVITER, Circuit Judge.

INTRODUCTION

General Motors Corporation (GM) filed this interlocutory
appeal, contending that the action brought against it is
preempted under the federal labor laws. The action was
filed by former GM employees who allege that GM
fraudulently induced them to accept early retirement. After
the District Court denied GM's motion for summary
judgment, GM sought, and received, certification of two
issues for interlocutory appeal: (1) whether the plaintiffs'
_____

*The Honorable Frank J. Magill, of the United States Court of Appeals for
the Eighth Circuit, sitting by designation.

fraud claims are preempted by section 301 of the Labor Management Relations Act (LMRA), and (2) whether the claims are preempted under sections 7 and 8 of the National Labor Relations Act (NLRA).

I.

BACKGROUND

The operative facts are, for the most part, undisputed. On December 3, 1992, GM issued a press release announcing that several of its plants were slated for closure by the end of the fourth quarter of 1993. Among those plants was the Inland Fisher Guide Division factory in Trenton, New Jersey. The employees at the Trenton plant were represented by Local # 731 of the United Automobile Aerospace and Agricultural Implement Workers of America Union (UAW), and, at all relevant times, were covered by a collective bargaining agreement between GM and the UAW. On December 14, 1992, shortly after GM's announcement of the anticipated plant closures, GM and the UAW reached an agreement, denominated as the Special Acceleration Attrition Agreement (SAAA), under which employees over the age of 50 who had more than 10 years of service with the company could take an early retirement package. The SAAA program was available only until March 1, 1993, a period of slightly more than two months. GM insists that, despite the temporal proximity of the announced plant closings and the agreement establishing the SAAA, the negotiation of the SAAA was unrelated to the announced plant closures, a proposition that plaintiffs do not appear to dispute.

On December 23, 1992, Terry Marquis, the manager of the Trenton plant, issued a newsletter to the plant's employees confirming that the plant would be closed and advising the employees to disregard any rumors to the contrary. The newsletter stated, in relevant part:

> Believe me when I say that all talk about potentially keeping Trenton open is false optimism originating right from this plant. No one at our divisional executive level is actively working on a scenario that could

5

> possibly keep Trenton open. . . . I know I'm being
> blunt, but I know there are many people making
> difficult decisions regarding retirement. I would not
> want any rumors influencing those decisions. The
> worst thing anyone could do would be to turn down
> one of the best mutual retirement programs available
> because of a rumor and then later lose what is
> available when the plant closes.

App. at 1109. A February 9, 1993 newsletter, also authored by Marquis, emphatically reiterated that the plant was going to be closed. In the newsletter, Marquis stated, "Let me leave no doubt -- the plant is closing. Many people take the absence of visible movement of jobs, tools, and equipment as a sign that something is up. Not so!" App. at 1203.

Nearly 200 of the employees at the Trenton plant accepted the SAAA early retirement package before the March 1, 1993 deadline. On March 3, 1993, GM announced plans to pursue the sale of the plant as a going concern as a possible alternative to closure. In the course of the following year, GM negotiated with several companies, but no agreement was reached. In May 1994, GM approved a plan--drafted by a joint labor-management committee--to keep the Trenton plant open.

Six of the GM Trenton employees who accepted the SAAA package filed this suit against GM on January 31, 1995 in federal district court. Plaintiffs asserted three state-law claims: fraud, negligent misrepresentation, and age discrimination. Plaintiffs also filed an action in the same court on June 21, 1995 against Local # 731 and against the UAW (collectively "the Union"), alleging breach of the duty of fair representation. Both suits were filed by plaintiffs on behalf of themselves and a putative class of former Trenton workers. The District Court consolidated the two actions, later dismissed the age discrimination claim against GM, and thereafter denied plaintiffs' motion for class certification in the GM action. However, the court permitted amendments adding 185 individual plaintiffs.

Plaintiffs then filed an amended two-count complaint. Count one is directed at GM and alleges fraud; count two

6

is against the Union and alleges a breach of the duty of fair representation. The complaint alleges that from December 3, 1992 to March 2, 1993--the period during which the early retirement option was available--GM falsely represented to the Trenton employees that the plant would close and that no efforts were being made to keep the plant open, when in fact the company was actively seeking to sell the factory as a going concern. GM knowingly made these false representations, the complaint alleges, to induce the employees to take the early retirement package (thereby presumably making the plant more attractive to potential buyers). The complaint alleges that the 191 plaintiffs relied on GM's representations to their detriment by giving up their jobs for a retirement package that they would not have accepted if they had known that there was a possibility of the plant's staying open. GM and the Union defendants moved for summary judgment.

The District Court granted summary judgment in favor of the Union, and that issue is not before us. At the same time, it denied GM's motion for summary judgment, ruling that the fraud claim was not preempted by either the LMRA or the NLRA and that, on the basis of the record evidence, a reasonable jury could conclude that the plaintiffs satisfied the elements of common-law fraud under New Jersey law.

At GM's request, the court certified and we accepted two issues for interlocutory appeal under 28 U.S.C. S 1292(b): whether plaintiffs' fraud claim against GM is preempted by (1) section 301 of the LMRA, or (2) sections 7 and 8 of the NLRA under the principles of so-called "Garmon preemption." Our standard of review is plenary. See Travitz v. Northeast Dep't. ILGWU Health and Welfare Fund, 13 F.3d 704, 708 (3d Cir. 1994).

II.

DISCUSSION

The District Court's certification order accurately frames the issues:

> (1) whether plaintiffs' fraud claim is preempted by
> S 301 of the Labor-Management Relations Act ("LMRA"),

7

29 U.S.C. S 185, because resolution of this claim is substantially dependent upon analysis of the terms of the GM-UAW collective bargaining agreements; [and]

(2) whether plaintiffs' fraud claim is preempted by SS 7 and 8 of the National Labor Relations Act ("NLRA"), particularly the Garmon preemption doctrine[.]

Voilas v. General Motors Corp., Nos. 95-487, 95-2960, slip op. at 2 (D.N.J. Sept. 2, 1997). We address these issues in turn.

A.

Section 301 Preemption

GM argues that plaintiffs' fraud claim runs afoul of the preemption doctrine that has developed around section 301 of the LMRA, 29 U.S.C. S 185. This is so, argues GM, because resolution of plaintiffs' fraud claims would require analysis and interpretation of collective bargaining agreements between the UAW and GM, an undertaking not permitted by the LMRA preemption doctrine.

Section 301(a) of the LMRA states, in relevant part:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. S 185(a).

The Supreme Court, in Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 455-56 (1957), made clear that this provision is not merely jurisdictional, but is also one that calls on the federal courts to create a uniform federal common law of collective bargaining, with the primacy of arbitral resolution of industrial disputes as its centerpiece. Accordingly, the Court has held that state laws that might produce differing interpretations of the parties'

8

obligations under a collective bargaining agreement are preempted. See Local 174, Teamsters of Am. v. Lucas Flour Co., 369 U.S. 95, 103-04 (1962). The Lucas Flour Court explained the particular need for uniformity under section 301 thus:

> The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract.

Id. at 103.

The jurisprudence of preemption of state-law claims under section 301 thereafter evolved in a series of Supreme Court cases decided from 1985 to 1994. The standard for determining when a state claim is preempted was first articulated in Allis-Chalmers Corp. v. Lueck, 471 U.S. 202 (1985). In that case, an employee, who had suffered an injury that qualified him for disability benefits under his collective bargaining agreement, filed a tort claim against his employer for bad-faith processing of an insurance claim under a Wisconsin bad-faith tort statute. He alleged that the employer had harassed him for filing the claim and had directed the insurer to cease making payments to him. The Supreme Court found the claim preempted. In so doing, it stressed that the mere characterization of the claim as sounding in tort rather than contract did not bar the operation of section 301 preemption and reasoned that preemption of the employee's claim was necessary in order to avoid "allow[ing] parties to evade the requirements of S 301 by relabeling their contract claims as claims for tortious breach of contract." Id. at 211.

The Allis-Chalmers Court articulated the standard for preemption as follows: "[W]hen resolution of a state-law

9

claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a S 301 claim or dismissed as pre-empted . . . ." Id. at 220 (citation omitted). Applying this standard, the Court concluded that in that particular case "[t]he duties imposed and rights established through the state tort . . . derive from the rights and obligations established by the [collective bargaining] contract," and that, consequently, resolution of the issue would "inevitably . . . involve contract interpretation." Id. at 217-18.

The Court reiterated this standard two years later in Caterpillar, Inc. v. Williams, 482 U.S. 386 (1987), where, in contrast to Allis-Chalmers, the Court concluded that there was no preemption of employees' state law claims. The employees had filed suit in state court against Caterpillar, alleging a state law claim of breach of their individual contracts with the employer based on its representations that "they could look forward to indefinite and lasting employment" and that "they could count on the corporation to take care of them." Id. at 388 (citation omitted). Caterpillar removed the action to federal court, relying on the doctrine of "complete preemption." The Supreme Court concluded that the claims did not arise under federal law, that the lawsuit was not preempted, and that therefore it was improperly removed. The Court stated:

> Respondents allege that Caterpillar has entered into and breached individual employment contracts with them. Section 301 says nothing about the content or validity of individual employment contracts. It is true that respondents, bargaining unit members at the time of the plant closing, possessed substantial rights under the collective agreement, and could have brought suit under S 301. As masters of the complaint, however, they chose not to do so.

> Moreover, . . . respondents' complaint is not substantially dependent upon interpretation of the collective-bargaining agreement. It does not rely upon the collective agreement indirectly, nor does it address the relationship between the individual contracts and the collective agreement.

10

Id. at 394–95. Thus, under Caterpillar, employees have the option of vindicating their interests by means of either a section 301 action or an action brought under state law, as long as the state-law action as pleaded does not require interpretation of the collective bargaining contract.

The Court further elaborated the principles governing section 301 analysis in Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399 (1987). In Lingle, the employee filed suit against her employer in state court, alleging retaliatory discharge for filing a workers' compensation claim, a tort recognized by the Illinois courts. The employer removed the action to federal court, and then was successful in moving to dismiss on the ground of preemption. The Supreme Court disagreed, holding that the claim was not preempted. The Court reasoned that the elements of the relevant cause of action––discharge or threats of discharge coupled with intent to deter or interfere with the exercise of rights under the worker's compensation law––did not implicate the collective bargaining agreement. It stated, "Each of these purely factual questions pertains to the conduct of the employee and the conduct and the motivation of the employer. Neither of the elements requires a court to interpret any term of a collective-bargaining agreement." Id. at 407.

The Lingle Court distinguished Allis-Chalmers and Lucas Floor on that basis, explaining that it had found the claims in those cases preempted because the state law claims were not "independent" of the collective bargaining agreements. Id. at 407 & n.7. The Court recognized that"the state-law analysis [of the claim for retaliatory discharge] might well involve attention to the same factual considerations as the contractual determination of whether Lingle was fired for just cause." Id. at 408. But, it stated, "such parallelism" did not make "the state-law analysis dependent upon the contractual analysis." Id. It continued,"Even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is `independent' of the agreement for S 301 pre-emption purposes." Id. at 409-410.

11

The Lingle Court explained that section 301 preemption is premised on a policy of preserving the effectiveness of arbitration by preventing employees from end-running the dispute resolution process: "Today's decision should make clear that interpretation of collective-bargaining agreements remains firmly in the arbitral realm; judges can determine questions of state law involving labor-management relations only if such questions do not require construing collective-bargaining agreements." Id. at 411 (footnote omitted). Further, the Court emphasized that "the mere fact that a broad contractual protection . . . may provide a remedy for conduct that coincidentally violates state law does not make the existence or the contours of the state-law violation dependent upon the [collective bargaining agreement]." Id. at 412-13. It is of interest that all three decisions, Allis-Chalmers, Caterpillar, and Lingle, were unanimous.

The Court's latest word on this subject came in its 1994 decision in Livadas v. Bradshaw, 512 U.S. 107 (1994). This case involved a California statute that imposed a penalty on employers who failed to pay accrued wages immediately upon the discharge of an employee. The State Labor Commissioner construed state law to bar the state from enforcing the penalty when the employee was covered by a collective bargaining agreement. Livadas, an employee covered by a collective bargaining agreement, filed a claim with the state's enforcement division to recover the penalty after she was fired from her supermarket job. When her application was denied because of the state's policy, Livadas sued in federal court, challenging the policy as preempted by the federal labor laws. Looking at it in reverse, Livadas claimed that her state law claim was not preempted by the federal labor laws.

The principal issue in the Livadas case was not preemption by section 301 of the LMRA, which is focused on the enforcement of collective bargaining agreements, but by section 7 of the NLRA, which grants employees certain rights, notably "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively . . . , and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

12

29 U.S.C. S 157. That is, Livadas argued that the Commissioner's policy of enforcing the penalty with respect to non-union workers while refusing to do so with respect to union workers interfered with the rights granted by section 7. The Court agreed with Livadas that the Commissioner's policy discriminated between union and nonunion workers, interfered with Livadas's rights under section 7 of the NLRA, and was therefore preempted. In reaching this conclusion, however, the Court had to address the Commissioner's contention that section 301 preempted Livadas's late-wage-payment claim and thereby compelled the state policy. Writing for what was again a unanimous Court, Justice Souter offered the following summary of the Court's section 301 doctrine:

> [T]he pre-emption rule has been applied only to assure that the purposes animating S 301 will be frustrated neither by state laws purporting to determine "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement," nor by parties' efforts to renege on their arbitration promises by "relabeling" as tort suits actions simply alleging breaches of duties assumed in collective-bargaining agreements.

> In Lueck and in Lingle . . . , we underscored the point that S 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law, and we stressed that it is the legal character of a claim, as "independent" of rights under the collective-bargaining agreement, . . . that decides whether a state cause of action may go forward. Finally, we were clear that when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished.

Id. at 122-24 (citations and footnotes omitted). Accordingly, the Court concluded that Livadas's action seeking enforcement of the state law penalty was not precluded and that the Commissioner's policy declining to enforce her state law right was preempted.

13

In a similar analysis shortly thereafter, the Court emphasized the limitations on its Lingle holding in Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246 (1994), a case involving the "virtually identical" standard for preemption under the Railway Labor Act, id. at 260. Like Lingle, Hawaiian Airlines involved an employee's claim of retaliatory discharge. Noting the similarity to the Lingle facts, the Court stressed that "the existence of a potential [collective bargaining agreement]-based remedy [does] not deprive an employee of independent remedies available under state law" and reiterated that factual questions about an employee's or employer's motives or conduct do not require interpretation of the collective bargaining agreement.[1] Id. at 261.

We had occasion to apply the Court's section 301 jurisprudence with respect to a fraud claim in Trans Penn Wax Corp. v. McCandless, 50 F.3d 217 (3d Cir. 1995). The plaintiffs in Trans Penn, employees covered by a collective bargaining agreement, brought claims against their employer for breach of contract, fraud, and intentional infliction of emotional distress. The gravamen of the complaint was that Trans Penn had made promises to the employees that they would retain their jobs if they decertified their union and that, after the employees did so, the employer reneged on those promises. We held that none of these claims were preempted by section 301. Of particular relevance to the present case is our holding on the fraud claim. Emphasizing the distinction made in Lingle

_____

1. It is also worth noting that a recent opinion of the Supreme Court, Textron Lycoming Reciprocating Engine Div., AVCO Corp. v. United Automobile, Aerospace, Agricultural Implement Workers of America, International Union, 118 S.Ct. 1626 (1998), has taken a very narrow view of federal jurisdiction under section 301. The UAW sued Textron, alleging that the employer fraudulently induced the union to sign the collective bargaining agreement. The court held that because the suit alleged only the invalidity of the collective bargaining agreement, and did not allege an actual violation of the collective bargaining agreement, there was no federal jurisdiction. Although Textron did not involve section 301 preemption, it did signal a narrow approach to section 301 jurisdiction. Because jurisdiction under section 301 is the obverse of preemption, the Textron decision suggests a correspondingly narrow scope for preemption.

14

between factual questions about motive, on the one hand, and the interpretation of a collective bargaining agreement, on the other, we concluded that "[a]n examination of the employer's behavior, motivation, and statements does not substantially depend upon the terms of the collective bargaining agreement." Id. at 232.

With these principles in mind, we turn to the case before us. To reiterate, plaintiffs contend that GM committed common-law fraud by intentionally lying to the employees about the status of the Trenton plant in order to induce them to leave voluntarily, thereby reducing the payroll. The New Jersey Supreme Court has stated that "[a] misrepresentation amounting to actual legal fraud consists of a material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment." Jewish Ctr. of Sussex County v. Whale, 432 A.2d 521, 524 (N.J. 1981). GM urges that a decision whether these elements have been shown would require the kind of interpretation of the collective bargaining agreement prohibited by the section 301 preemption doctrine. We are unpersuaded.

GM first focuses on the intent requirement, contending that resolution of the issue of GM's intent "requires interpretation of the collectively-bargained Special Accelerated Attrition Agreement." Appellant's Br. at 23. GM's intent in entering into the SAAA, however, is not the question put in issue by plaintiffs' complaint. Rather, plaintiffs focus on GM's intent in representing that closure of the plant was imminent. The amended complaint plainly alleges that "GM intentionally misrepresented to Plaintiffs the status of the plant closing." App. at 187. "GM made the misrepresentations, including the omission of information, for the purpose of inducing Plaintiffs to quit their jobs and accept the SAAA." App. at 188. Hence, plaintiffs are not claiming that GM misrepresented the SAAA, but rather they are claiming that GM intentionally lied to them in order to induce them to end their employment with GM and take the SAAA. The resolution of this claim in no way requires an interpretation of the SAAA.

15

GM's arguments on materiality, reasonable reliance, and detriment are predicated on a single idea--that the representations cannot be material unless there were no options available to the employees other than the SAAA package. Again, GM misapprehends the nature of plaintiffs' claim. The materiality question in this case does not focus on the availability of other options but on whether GM's announcement of the impending closure of the Trenton plant was a representation of a fact (1) that the employees would reasonably consider important in making choices about their employment, or (2) that GM actually or constructively knew would inform the employees' choices.

Under New Jersey law, a fact is material if "a reasonable [person] would attach importance to its existence or nonexistence in determining his [or her] choice of action in the transaction in question," or if "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his [or her] choice of action, although a reasonable [person] would not so regard it." Strawn v. Canuso, 657 A.2d 420, 431 n.4 (N.J. 1995)(quoting Restatement (Second) of Torts S 538(2) (1977)). The resolution of these questions does not call upon the court to conduct an investigation into the terms of the collective bargaining agreements between the parties; it simply requires a determination of whether and how the announced closure of the plant would affect the decisions of the employees.

GM further argues that the "reasonable reliance" question requires interpretation of the collective bargaining agreement because one cannot determine whether the plaintiffs acted reasonably without weighing all of the contractual options available to them. We note at the outset that although the parties use the term "reasonable" to describe the level of reliance necessary to support a fraud cause of action, the New Jersey cases have yet to address specifically what kind of reliance is necessary. See B.F. Hirsch v. Enright Ref. Co., 751 F.2d 628, 632 (3d Cir. 1984)("It is not entirely clear to what extent New Jersey law requires that the reliance be justifiable."). New Jersey cases speak of both "reasonable" and "justifiable" reliance.

16

Compare Judson v. Peoples Bank and Trust Co., 134 A.2d 761, 765 (N.J. 1957)(using "justifiable reliance"), and Van Dam Egg Co. v. Allendale Farms, Inc., 489 A.2d 1209, 1211 (N.J. Super. Ct. App. Div. 1985) (adopting "justifiable reliance"), with Louis Schlesinger Co. v. Wilson, 127 A.2d 13, 18 (N.J. 1956) (stating that action sounding in deceit requires "reasonable reliance"), and Carroll v. Celloco Partnership, 713 A.2d 509, 516 (N.J. Super. Ct. App. Div. 1998)(stating that common-law fraud requires "reasonable reliance"). As the Supreme Court has recently reminded us, these terms carry different meanings: justifiable reliance generally connotes a subjective standard, while "reasonable reliance" usually suggests an objective standard and, possibly, some measure of a duty to investigate on the part of the claimant. See Field v. Mans, 516 U.S. 59, 70-75 (1995) (surveying the common law of fraud as it stood in 1978).

For present purposes, we need not predict which formulation the New Jersey Supreme Court will adopt, for both of these standards share a common general inquiry-- a focus on the credence given the representation by the claimant. That is, the reliance inquiry is not, as GM suggests, an investigation of the wisdom of the particular choice made by the claimant, but instead whether the claimant was acting justifiably or reasonably in giving credence to the alleged misrepresentation. See id. at 70-71. In this case, then, the reliance question focuses on whether GM's repeated insistence that the plant was going to close was a representation worthy of belief. Patently, this is not a question that depends upon an interpretation of the collective bargaining agreement. In Trans Penn, we considered, and rejected, a nearly identical argument when considering the elements of fraud under Pennsylvania law: "The essence of the employees' [fraud] case is proof of justifiable reliance on the separate guarantees[i.e., the company's promise of job security], not on the collective bargaining agreements." 50 F.3d at 232.

For similar reasons, we reject GM's contention that resolving whether the employees' reliance was detrimental would require an investigation of the terms of the collective bargaining agreements. To be sure, we anticipate that at

17

trial, principally in determining damages, the question whether the plaintiffs were worse off for having taken early retirement may arise. However, the fact that the parties' agreements may be referred to in the course of deciding this issue is of little moment to the preemption question before us. As the Court emphasized in Livadas, "the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." 512 U.S. at 124 (citation omitted). Similarly, as the Court stated in Lingle:

> A collective-bargaining agreement may, of course, contain information such as rate of pay and other economic benefits that might be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled. Although federal law would govern the interpretation of the agreement to determine the proper damages, the underlying state-law claim, not otherwise pre-empted, would stand. Thus, as a general proposition, a state-law claim may depend for its resolution upon both the interpretation of a collective-bargaining agreement and a separate state-law analysis that does not turn on the agreement. In such a case, federal law would govern the interpretation of the agreement, but the separate state-law analysis would not be thereby pre-empted.

486 U.S. at 413 n. 12 (citation omitted).

GM also raises an alternative argument that the fraud claim is founded directly on rights created by the collective bargaining agreement because any duty to disclose on the part of GM could only arise under the contract. In support of this contention, GM cites our decision in Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993), for the proposition that "a fraud claim based upon silence is not actionable unless there exists an affirmative duty to disclose; and such duty arises only when there is actually or essentially a fiduciary relationship." Appellant's Br. at 33.

The first difficulty with this argument is that plaintiffs do not base their fraud claim on GM's silence. The plaintiffs have alleged affirmative misrepresentations to the

18

employees, rather than a failure to disclose simpliciter. As stated by the Appellate Division of the New Jersey Superior Court, "Even where no duty to speak exists, one who elects to speak must tell the truth when it is apparent that another may reasonably rely on the statements made." Strawn v. Canuso, 638 A.2d 141, 149 (N.J. Super. App. Div. 1994), aff'd, 657 A.2d 420 (N.J. 1995). Therefore, the relevance of our discussion in Lightning Lube of New Jersey law concerning fraud claims based on silence is questionable at best. Furthermore, to the extent that Lightning Lube is pertinent here, it is contrary to GM's position. In that case, we stated: "[W]here a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a `special relationship.' " 4 F.3d at 1185 (quoting Berman v. Gurwicz, 458 A.2d 1311, 1313 (N.J. Super. Ct. Ch. Div. 1981)). At minimum, plaintiffs have alleged, and provided record support for, a "previous statement" that is untrue without a timely disclosure of the company's plan to pursue sale of the plant.

In sum, the fraud claim in this case is not directly based upon the collective bargaining agreements in force between the parties; nor will the resolution of the elements of common-law fraud require the interpretation of those bargaining agreements. Plaintiffs, in pursuing their fraud claim, are seeking vindication of a "nonnegotiable right[ ] conferred on individual employees as a matter of state law" that is " `independent' of rights under the collective-bargaining agreement." Livadas, 512 U.S. at 123. Resolution of the common-law fraud issue in this action will not frustrate the uniform development of federal law governing labor contract interpretation nor allow the employees to sidestep the grievance machinery by dressing up a contract grievance as a tort. Consequently there is no ground for section 301 preemption in this case. Accordingly, we turn to the question whether the NLRA preempts plaintiffs' cause of action.

19

B.

Garmon Preemption

GM also urges that the plaintiffs' fraud claims are preempted by sections 7 and 8 of the NLRA under the principles of Garmon preemption, a doctrine originating in the Supreme Court's decision in San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959). Garmon preemption protects the exclusive jurisdiction of the NLRB over unfair labor practice proceedings; accordingly, if a cause of action implicates protected concerted activity under section 7 of the NLRA or conduct that would be prohibited as an unfair labor practice under section 8 of the NLRA, the cause of action is preempted. See id. at 242-44.

The Court summarized the nature of Garmon preemption in Belknap, Inc. v. Hale, 463 U.S. 491 (1983):

> [S]tate regulations and causes of action are presumptively preempted if they concern conduct that is actually or arguably either prohibited or protected by the Act. The state regulation or cause of action may, however, be sustained if the behavior to be regulated is behavior that is of only peripheral concern to the federal law or touches interests deeply rooted in local feeling and responsibility.

Id. at 498 (citations omitted).

In International Longshoremen's Association v. Davis, 476 U.S. 380 (1986), the Court elaborated on what it meant by "arguably" in the prior Garmon preemption cases:

> If the word "arguably" is to mean anything, it must mean that the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in [the suing employee's] favor. That is, a party asserting pre-emption must advance an interpretation of the Act that is not plainly contrary to its language and that has not been "authoritatively rejected" by the courts or the Board. The party must then put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation.

20

Id. at 395 (citation omitted). The party claiming preemption bears the burden of demonstrating that the challenged activity is arguably prohibited by the NLRA. Id.

GM urges that the conduct which is the subject of plaintiffs' complaint would constitute a refusal to bargain under section 8(a)(5) of the Act and/or bargaining in bad faith under section 8(d) of the Act. Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees" and section 8(d) imposes a requirement that such bargaining be done "in good faith." 29 U.S.C. SS 158(a)(5), (d). However, the duties to bargain and to do so in good faith only attach to the "mandatory subjects of bargaining," which are those set forth in section 8(d), i.e., "wages, hours, and other terms and conditions of employment." Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of N. Am., AFL-CIO v. Jewel Tea Co., 381 U.S. 676, 685 (1965) (citation omitted); see also NLRB v. Katz, 369 U.S. 736, 742-43 (1962).

If an employer imposes a unilateral change with respect to a mandatory subject, it thereby violates the statutory duty to bargain and is subject to the Board's remedial order. See Katz, 369 U.S. at 742-43. But, conversely, a unilateral change as to a non-mandatory subject and the refusal to bargain over a non-mandatory subject are not unfair labor practices. NLRB v. Wooster Div. of Borg-Warner, 356 U.S. 342, 349 (1958). The decision to close a plant is plainly one that the employer can make and announce unilaterally; that decision is not a mandatory subject of bargaining. See First Nat'l. Maintenance Corp. v. NLRB, 452 U.S. 666, 686 (1981). But see id. at 677 n.15 (noting that employer has a duty to bargain over the effects of such a closure). Consequently, there is no Board jurisdiction, and therefore no Garmon preemption, regarding complaints that an employer refused to bargain over a plant closing.

It is true, as GM argues, that the employer's duty to bargain in good faith is a continuing one, and that it is not dispositive that formal collective negotiations were not occurring at the time of an alleged breach of sections 8(a)(5) and 8(d). However, the alleged fraud was not committed in connection with any part of the collective bargaining

21

process nor does it touch and concern a mandatory duty on the part of the employer. The plaintiffs do not allege that any bargaining between the Union and GM was in bad faith, or that the retirement benefits that they received were other than provided for them under the relevant agreement.

Because GM has no duty under the NLRA to bargain over its decision regarding the closing of a plant, First Nat'l Maintenance, 452 U.S. at 679 n.15, and the plaintiffs' complaint does not allege that GM breached its duty to bargain over effects, the matter that forms the basis of this fraud action--viz., GM's intent vel non to close its Trenton plant--cannot be recast as an unfair labor practice under either section 8(d) or section 8(a)(5). Where, as here, the claim is that the employer committed fraud in a direct communication to the employees on the subject of a plant closure, there is no NLRA preemption.

Comparison with the very cases cited by GM underscores why the District Court correctly found no preemption here. For example, in Serrano v. Jones & Laughlin Steel Co., LTV, 790 F.2d 1279 (6th Cir. 1986), the employees' fraud claims that were held preempted implicated the bargaining process directly because the employees claimed that the employer defrauded them by extracting concessions in bargaining while falsely promising to invest in the plant to keep it going. The Serrano court stated: "[T]he gravamen of the three fraud charges is that J & L did not bargain in good faith in obtaining concessions from the Union in the [collective bargaining] agreement." Unlike Serrano, this case does not concern the employer's extraction of concessions from the union in bargaining, but rather concerns GM's alleged fraudulent announcement that the plant would close, an announcement that was independent of the bargaining process.

This distinction holds true for the other cases cited by GM where the employees' claims were preempted. See Parker v. Connors Steel Co., 855 F.2d 1510, 1515-18 (11th Cir. 1988)(fraud claim relating to concessions obtained by employer during bargaining); Kolentus v. Avco Corp., 798 F.2d 949, 960-62 (7th Cir. 1986)(claim of fraudulent nondisclosure of plan to close plant during contract negotiations); see also Talbot v. Robert Matthews Distrib.

22

Co., 961 F.2d 654, 660 (7th Cir. 1992) (finding preemption of claim that bargaining-unit work was improperly transferred without a union vote because claim was equivalent to charge that employer unilaterally changed terms and conditions of employment in violation of section 8(a)(5)). In contrast to those cases, here there is no necessary nexus between the challenged representations and collective bargaining.

Courts considering cases that more closely parallel the situation here have found no preemption. In Wells v. General Motors Corp., 881 F.2d 166 (5th Cir. 1989), employees alleged that the employer offered false inducements in order to persuade the employees to accept a voluntary termination plan which, like the one in this case, was the product of prior collective bargaining. The employer was alleged to have misrepresented the employees' eligibility for rehire if they accepted the plan. The court found the fraud claim was not preempted under Garmon principles or section 301. The court reasoned that the claim could not be construed as one of bargaining in bad faith, and emphasized that eligibility for future employment is not a mandatory bargaining subject. Turning then to whether the complaint could be recast as an allegation of direct dealing with the employees, the court stated, in a passage equally applicable here: "For better or worse, the bargaining process had served its function, and the union representatives had fulfilled their role [by negotiating the voluntary termination agreement]. It was then left to the individual employees to choose whether they would opt for the plan, and it is upon that choice that GM's alleged inducements operated." Id. at 171-72. To the same effect is the Ninth Circuit's decision in Milne Employees Association v. Sun Carriers, 960 F.2d 1401 (9th Cir. 1992) (finding no preemption where plaintiffs raised fraud claims based on the allegation that the employer made representations of continuing employment while actively concealing plans to close the plant).

In short, GM has not met its burden of demonstrating that this case is one that the Board could legally decide in the employees' favor. GM has not shown that its alleged misrepresentation to the employees would be an unfair

23

labor practice. And, as noted previously, plaintiffs' fraud claim does not require interpretation of the collective agreements between the parties such that preemption under LMRA section 301 would be appropriate.

III.

CONCLUSION

For the foregoing reasons, we will affirm the District Court's denial of GM's summary judgment motion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit