

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-29-1999

# Beidleman v. Stroh Brewery Co

Precedential or Non-Precedential:

Docket 98-1420

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Beidleman v. Stroh Brewery Co" (1999). *1999 Decisions.* Paper 175.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/175

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 29, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-1420

C. DAVID BEIDLEMAN; CHARLES BOGUSKY, JR.;
BUDD A. FRANKENFIELD, JR.; DALE E. MILLER;
JAMES K. REICHENBACH; DONALD P. SCHRADEN;
LARRY E. WEDGE,

        Appellants,

v.

THE STROH BREWERY COMPANY; MIKE GRAY; RONALD
L. GOLUMBECK; INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, LOCAL #773; PHILIP M. DEPIETRO;
BREWERY WORKERS INTERNATIONAL BROTHERHOOD
OF TEAMSTERS, LOCAL #12; JIM MALEY;
JOHN BOISITZ; STEPHEN A. BANUS

APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 97-cv-05115)
(District Judge: Honorable Edward N. Cahn)

ARGUED JANUARY 15, 1999

BEFORE: NYGAARD, ALITO, and LEWIS, Circuit Judges.

(Filed June 29, 1999)

        DONALD P. RUSSO (ARGUED)
        60 West Broad Street
        P.O. Box 1890, Suite 300
        Bethlehem, PA 18106

         Attorney for Appellants

MARK A. FONTANA (ARGUED)
Reed Smith, Shaw & McClay
213 Market Street
P.O. Box 11844
Harrisburg, PA 17101

 Attorney for Appellees, The Stroh
 Brewery Company, Mike Gray and
 Ronald L. Golumbeck

WILLIAM T. JOSEM (ARGUED)
Cleary & Josem
1420 Walnut Street, Suite 300
Philadelphia, PA 19102

 Attorney for Appellees,
 International Brotherhood of
 Teamsters, Local #773

THOMAS H. KOHN
Sagot, Jennings & Sigmond
510 Walnut Street
The Penn Mutual Towers, 16th Floor
Philadelphia, PA 19106-3683

 Attorney for Appellees, Brewery
 Workers International Brotherhood
 of Teamsters, Local #12, Jim Maley
 and John Boisitz

OPINION OF THE COURT

LEWIS, Circuit Judge.

In this appeal, we must determine whether the
preemptive force of section 301 of the Labor Management
Relations Act ("LMRA"), 29 U.S.C. S 185, applies to bar the
state-law claims of seven employees of The Stroh Brewery
Company ("Stroh"). In making this determination, we must
address a panoply of issues relating to section 301
preemption, including: (1) whether an agreement negotiated
between an employer and a labor union with the goal of
ending a labor dispute constitutes a "collective bargaining
agreement"; (2) whether state-law claims that rely, in part,

2

on the interpretation of such an agreement are subject to section 301 preemption; and (3) whether tort claims alleged against both an employer and a labor union comprise a "hybrid" action. Because we conclude that each of these questions must be answered in the affirmative, we will affirm the District Court's judgment.

I.

The appellants, C. David Beidleman, Charles Bogusky, Budd Frankenfield, Dale Miller, James Reichenbach, Donald Schraden and Larry Wedge (collectively, the "employees") appeal the District Court's order dismissing their complaint for failure to state a claim upon which relief may be granted. Since the District Court disposed of the employees' claims on a motion to dismiss, we must accept as true the employees' allegations. Thus, we will base our recitation of the facts on the allegations in the complaint. See Hindes v. FDIC, 137 F.3d 148, 153 (3d Cir. 1998).

Prior to June 30, 1985, the employees worked as truck drivers at Stroh's brewery in Lehigh County, Pennsylvania. As truck drivers, the employees were members of Teamsters Local 773 ("Local 773"), and subject to Local 773's collective bargaining agreement with Stroh. On March 22, 1985, Stroh notified Local 773 of its intent to terminate its trucking operations. The termination was to take effect on June 30, 1985. Following this notification, representatives of Stroh and Local 773 held three collective bargaining sessions in an attempt to reach an agreement concerning the impending termination. The meetings failed to produce an agreement, and on June 30, 1985, Stroh terminated the employees. That same day, the collective bargaining agreement between Local 773 and Stroh expired.

On July 1, 1985, the forty-seven truck drivers represented by Local 773 initiated an economic strike against Stroh. While the strike was ongoing, negotiations between Stroh, Local 773 and Teamsters Local 12 ("Local 12") continued.1 On August 15, 1985, the parties reached

───────────────────────────────────────────

1. Stroh's production workers, whose collective bargaining agreement also expired on June 30, 1985, refused to cross the picket line set up by Local 773. Initially, these production workers were represented by Teamsters Local 522; however, during the strike the workers voted to replace Local 522 with Local 12. Thus, Local 12 also participated in the settlement negotiations.

an agreement whereby: (1) the majority of the drivers were laid off and given severance payments and other benefits; (2) four drivers were retained; and (3) the rest of the drivers -- including the seven employees -- were placed on a "master seniority list" that provided them with recall rights in the event that additional production workers were needed, and "endtail" seniority rights in the event that they were rehired. The parties reduced this settlement agreement to a "closing agreement" ("1985 closing agreement"), which Stroh later incorporated into a formal contract. The closing agreement was read to the members of Local 773, who then voted to end the strike on August 15, 1985.

During 1994 and 1995, Stroh began to hire "temporary to full time" workers for its production department. Soon thereafter, Local 773's Vice President, William Hontz, advised Stroh that these hires violated the recall rights of the employees under the 1985 closing agreement. On August 21, 1995, Stroh's Human Resources Manager Mike Gray sent the employees a letter offering them reemployment in the production department. On April 8, 1996, Stroh rehired the employees.

The employees allege that following their rehire, Stroh, Local 773, Local 12 and certain of their employees or agents engaged in a pattern of conduct that had the purpose and effect of denying them their rights under the 1985 closing agreement. According to the employees, Stroh violated their recall rights under the 1985 closing agreement by hiring the "temporary to full time" production workers during 1994 and 1995. Moreover, by refusing to grant the employees retroactive seniority upon rehire in 1996, the employees maintain that Stroh violated the "endtail" seniority provision of the 1985 closing agreement. The employees contend that the appellees have repeatedly denied having knowledge of the whereabouts and/or existence of the 1985 closing agreement, and have refused to honor its terms.[2]

_____

2. In their brief, the employees state that during June of 1996, Local 12 advised them that it was not aware of the 1985 agreement and that unless the employees could produce a copy of the agreement, they could

4

On June 21, 1997, the employees filed a complaint in the Court of Common Pleas of Lehigh County, Pennsylvania, alleging that the conduct of Stroh and the other appellees amounted to: (1) fraudulent misrepresentation; (2) tortious interference with contractual relations; and (3) civil conspiracy. The appellees removed the action to the United States District Court for the Eastern District of Pennsylvania on the grounds that section 301 of the LMRA preempted the employees' claims. The employees filed a subsequent motion to remand the case to state court, which the District Court denied.

The District Court granted the appellees' joint motion to dismiss for failure to state a claim. The court concluded, "[b]ecause . . . none of plaintiffs' claims can meaningfully be described as being independent of a collective-bargaining agreement . . . all of plaintiffs' claims are completely preempted by section 301." Beidleman v. Stroh Brewery Co., 1998 WL 254979, *5 (E.D. Pa. 1998). Since the parties did not dispute that the employees' claims were untimely if preempted by section 301, the court dismissed the employees' complaint with prejudice. Id.

The employees now appeal the District Court's order granting the appellees' joint motion to dismiss, and its order denying their motion to remand. We have jurisdiction over this appeal pursuant to 28 U.S.C. S 1291. We review a district court's grant of a motion to dismiss de novo. See Lake v. Arnold, 112 F.3d 682, 684 (3d Cir. 1997).

II.

The employees challenge the District Court's order dismissing their complaint on three grounds: (1) the 1985

_____

not file any grievances relating to the 1985 seniority issues set forth in the complaint. Likewise, the employees contend that Local 773 informed them that its "files had been purged," that it did not have a copy of the 1985 closing agreement, and that without the agreement it would not assist the employees in enforcing their alleged rights. Finally, the employees assert that Stroh notified them that "there was no shutdown agreement available" and that their seniority would be based on the respective dates of their re-hire in 1996.

5

closing agreement was a private employment contract, not a collective bargaining agreement, and thus was not subject to section 301 of the LMRA; (2) adjudication of the state-law claims alleged in the complaint does not require interpretation of the 1985 closing agreement; thus they are not preempted by section 301; and (3) the state-law claims do not constitute a "hybrid" action; thus the six-month statute of limitations articulated in DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 171-72 (1983), does not apply. We will address each argument in turn.

A.

At the outset, we must determine whether the 1985 closing agreement is a "collective bargaining agreement" for purposes of section 301 preemption, for if it is not, we lack subject matter jurisdiction over the employees' claims.3 See Textron Lycoming Reciprocating Engine Div. v. United Automobile, Aerospace, Agricultural Implement Workers of America, 118 S. Ct. 1626, 1631 (1998). The employees argue that the 1985 closing agreement is a "private employment contract" that cannot provide the basis for preemption. They note that the collective bargaining agreement between Local 773 and Stroh expired on June 30, 1985; thus, when the 1985 closing agreement was memorialized on August 15, 1985, they were not represented by a union. In addition, the employees argue that the purpose of the 1985 closing agreement was to

_____

3. Stroh contends that the employees waived the right to argue that the 1985 closing agreement is an individual contract by failing to raise the issue below. However, "the existence of an agreement between a labor organization and an employer is, for Section 301 purposes, a jurisdictional fact." Local 336, American Federation of Musicians v. Bonatz, 475 F.2d 433, 437 (3d Cir. 1973). Thus, because this issue directly impacts our subject matter jurisdiction over this appeal, it is appropriate for us to address it here. See State Farm Mutual Automobile Insurance Co. v. Powell, 87 F.3d 93, 96 (3d Cir. 1996) ("Although [plaintiff] did not raise this jurisdictional issue below, we may address it
for the first time on appeal `because the limited subject matter jurisdiction of the federal courts is so fundamental a concern in our system.' ") (quoting Page v. Schweiker, 786 F.2d 150, 153 (3d Cir. 1986)).

confer employment rights upon a "small group" of truck drivers, which renders it more akin to a private employment contract than a collective bargaining agreement. As support, the employees rely on the Supreme Court's decision in Caterpillar, Inc. v. Williams, 482 U.S. 386 (1987).

In Caterpillar, former salaried employees of Caterpillar Tractor Company filed suit alleging breach of individual employment contracts. The contracts consisted of oral and written representations made by Caterpillar, promising the employees alternative employment opportunities in the event that the company had to close the facility where they worked. See Caterpillar, 482 U.S. at 388-89. Caterpillar made these representations individually to each of the employees, and they were outside the scope of the collective bargaining agreement. See id. at 389. After Caterpillar breached its promise, the employees filed suit under California law. See id. at 390. In holding that the employees' breach of contract claims were not preempted by section 301, the Court stated:

> [the employees] allege that Caterpillar has entered into and breached individual employment contracts with them. Section 301 says nothing about the content or validity of individual employment contracts. It is true that [the employees], bargaining unit members at the time of the plant closing, possessed substantial rights under the collective agreement, and could have brought suit under S 301. As masters of the complaint, however, they chose not to do so.

Id. at 394-95.

We believe that the 1985 closing agreement is readily distinguishable from the agreement at issue in Caterpillar. Most significantly, the 1985 closing agreement was bargained for and negotiated by Stroh and the labor unions, not Stroh and the employees individually. The fact that the collective bargaining agreement between Local 773 and Stroh expired on June 30 did not remove Local 773's status as the employees' majority representative. See Hajoca Corp. v. NLRB, 872 F.2d 1169, 1173 (3d Cir. 1989) ("The presumption of [a union's] majority status survives

7

the expiration of a collective bargaining agreement.. . ."); International Association of Bridge, Structural & Ornamental Iron Workers, Local 3 v. NLRB, 843 F.2d 770, 772 (3d Cir. 1988) ("Upon the expiration of a collective bargaining agreement, the employer may not withdraw recognition of the union unilaterally unless it has reasonable, good faith grounds for believing that the union has lost its majority status"). In addition, the purpose of the 1985 closing agreement was not merely to confer benefits upon a "small group" of truck drivers. Rather, it served the dual purpose of providing the forty-seven members of Local 773 with employment rights and ending their economic strike against Stroh. Taken together, we find these factors sufficient to distinguish the 1985 closing agreement from the individual employment contracts in Caterpillar.

Moreover, for purposes of section 301, a labor contract need not be a "collective bargaining agreement" per se:

> It is enough that this is clearly an agreement between employers and labor organizations significant to the maintenance of labor peace between them. It came into being as a means satisfactory to both sides for terminating a protracted strike and labor dispute. Its terms affect the working conditions of the employees of both respondents. It effected the end of picketing and resort by labor organizations to other economic weapons, and restored strikers to their jobs. It resolved a controversy arising out of, and importantly and directly affecting, the employment relationship. Plainly it falls within S 301(a).

Retail Clerks International Association v. Lion Dry Goods, Inc., 369 U.S. 17, 28 (1962).

In their brief and at oral argument, the employees failed to distinguish satisfactorily the 1985 closing agreement from that described in Lion Dry Goods. Both were entered into by the employer and the labor unions to establish labor peace, and both resolved a controversy arising out of the employment relationship. Accordingly, we reject the employees' contention that the 1985 closing agreement is not a collective bargaining agreement.

8

B.

We now must turn to the question whether section 301 preempts the employees' state-law claims. The employees dispute the District Court's conclusion that resolution of their state-law claims is dependent upon the terms in the 1985 closing agreement. Specifically, they contend that their claims relate to the simple existence of the agreement, and that "at no point in [their] complaint[do they] seek to have the court interpret any substantive provision of the agreement." Appellant's Brief at 14.

Section 301(a) of the LMRA provides:

> Suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any District Court of the United States having jurisdiction over the parties.

29 U.S.C. S 185(a). Section 301 is not only jurisdictional, "it authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements." Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 451 (1957). In light of this mandate, the Supreme Court has held that any state-law cause of action for violation of a collective bargaining agreement is entirely preempted by section 301 of the LMRA, see Avco Corp. v. International Association of Machinists & Aerospace Workers, 390 U.S. 557, 559 (1968); Teamsters v. Lucas Flour Co., 369 U.S. 95, 103 (1962), because:

> [T]he subject matter of S 301(a) `is peculiarly one that calls for uniform law.' . . . The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same

9

> meaning under two more systems of law which might
> someday be invoked in enforcing the contract.

Lucas Flour, 369 U.S. at 103.

In Allis-Chalmers Corp. v. Lueck, 471 U.S. 202 (1985), the Supreme Court articulated the standard for determining whether a plaintiff 's state-law claims are preempted by section 301. There, the Court stated:

> When resolution of a state-law claim is substantially dependent upon analysis of the terms of a collective bargaining agreement, that claim must either be treated as a S 301 claim or dismissed as preempted by federal-labor contract law.

Allis-Chalmers, 471 U.S. at 220; see also id. at 213 (state-law claims are preempted if "inextricably intertwined with consideration of the terms of the labor contract").4 In Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399 (1988), the Supreme Court further defined this standard, stating that:

> if resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law . . . is preempted and federal labor-law principles . . . must be employed to resolve the dispute.

Id. at 405-06.

However, section 301 does not preempt every dispute that tangentially concerns the terms of a collective bargaining agreement. Allis-Chalmers, 471 U.S. at 211. "[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." Livadas v. Bradshaw, 512 U.S. 107, 124 (1994) (citing Lingle, 486 U.S. at 413, n.12 ("A collective-bargaining agreement may, of course, contain information such as rate of pay and other economic benefits that might

_____

4. In Berda v. CBS, Inc., 881 F.2d 20 (3d Cir. 1989), we concluded that the phrase "inextricably intertwined" was equivalent to "substantial dependence." Id. at 27 n. 8.

be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled.")).

Guided by these principles, we turn to an analysis of the employees' claims of fraudulent misrepresentation, tortious interference and civil conspiracy.

1. Fraudulent Misrepresentation

Under Pennsylvania law, a plaintiff must prove the following elements to succeed on a fraudulent misrepresentation claim:

> (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation and (5) damage to the recipient as the proximate result.

Moffat Enter., Inc. v. Borden, Inc., 807 F.2d 1169, 1174 (3d Cir. 1986) (quoting Scaife Co. v. Rockwell-Standard Corp., 285 A.2d 451, 454 (Pa. 1971)).

The employees maintain that in pleading this count, they at no point seek to have the court interpret any substantive provisions of the 1985 closing agreement. However, in Count I alleging fraudulent misrepresentation, the employees claim:

> P 71 – Plaintiffs believe, and therefore aver, that Defendants are fraudulently misrepresenting to the Plaintiffs that the Defendants are not bound by the terms of the 1985 closing agreement, when Defendants in fact know, or should be aware, that said closing agreement is a binding document even if a signed copy of the same is not physically produced.

Appendix ("App."), Tab 3 at 14 (emphasis added). Thus, the "misrepresentation" at issue is the appellees' refusal to acknowledge the validity of the 1985 closing agreement. Clearly, for a court to decide the merits of this claim it must interpret those terms in the agreement setting forth the appellees' obligations, for if the 1985 closing agreement does not contain terms that bind the appellees, then no "misrepresentation" exists.

11

The employees' reliance on Trans Penn Wax Corp. v. McCandless, 50 F.3d 217 (3d Cir. 1995) and our recent decision in Voilas v. General Motors Corp., 170 F.3d 367 (3d Cir. 1999) is unavailing.

In McCandless, the employer made the following representation to its employees, which was later alleged to be fraudulent:

> This is our PERSONAL GUARANTEE and your LEGAL CONTRACT that you . . . will have a job here . . . as long as you perform your work satisfactorily, follow up our customary rules, and we are economically able to operate this institution successfully and work is available. This GUARANTEE is given to you because of the FALSE UNION RUMOR that you will lose your job if the Union loses the election. . . . This is our WRITTEN LEGAL CONTRACT AND GUARANTEE TO YOU. . . .

Id. at 221 (emphasis in original). This personal guarantee was separate from the collective bargaining agreement between the parties. In holding that section 301 did not preempt the employees' fraud claims, we noted that "[t]his is not a situation . . . where the alleged tort is a violation of duties assumed in the collective bargaining agreement." Id. at 232. Rather, we concluded that resolution of the claim would require a court to examine only the employers' behavior, motivation and statements, which "does not substantially depend upon the terms of the collective bargaining agreement." Id.

Likewise, in Voilas, the employer, GM, made the following representation in a newsletter to its employees:

> Believe me when I say that all talk about potentially keeping [the Trenton plant] open is false optimism originating right from this plant. No one at our divisional executive level is actively working on a scenario that could possibly keep Trenton open . . . .. I know I am being blunt, but I know there are many people making difficult decisions regarding retirement. I would not want any rumors influencing those decisions. The worst thing anyone could do would be to turn down one of the best mutual retirement programs

12

> available because of a rumor and then later lose what
> is available when the plant closes.

See Voilas, 170 F.3d at 371. As a result, nearly 200 employees accepted an early retirement package that had been collectively bargained for by the employer and the union. See id. Two days after the deadline for accepting the early retirement package, GM announced plans to pursue alternatives to closing the Trenton plant--which ultimately it did keep open. See id. The employees then brought suit under New Jersey law alleging that the representation in the newsletter was fraudulent.

We began our section 301 analysis by noting that the plaintiffs' complaint alleged only that " `GM intentionally misrepresented . . . the status of the plant closing. . . for the purpose of inducing Plaintiffs to quit their jobs and accept the [early retirement agreement],' " and that it did not allege that GM made a misrepresentation concerning the collective bargaining agreement. Id. at 376 (quoting App. at 187-88). Thus, we concluded:

> [T]he fraud claim in this case is not directly based
> upon the collective bargaining agreements in force
> between the parties, nor will the resolution of the
> elements of common law fraud require the
> interpretation of those bargaining agreements.
> Plaintiffs, in pursuing their fraud claim, are seeking
> vindication of a `nonnegotiable right . . .' that is
> " `independent" of rights under the collective bargaining
> agreement.' Resolution of the common law fraud issue
> in this action will not frustrate the uniform
> development of federal law governing labor contract
> interpretation nor allow the employees to sidestep the
> grievance machinery by dressing up a contract
> grievance as a tort. Consequently, there is no ground
> for section 301 preemption in this case.

Id. at 378 (internal citations omitted).

There are a number of factors that differentiate the employees' fraudulent misrepresentation claim from those alleged in McCandless and Voilas. Chief among them is the fact that the employees' claim stems directly from a collective bargaining agreement, whereas the claims in

13

McCandless and Voilas arose from an agreement or representation that was independent of any collective bargaining agreement. While this distinction, standing alone, might be insufficient to support a finding of section 301 preemption, the employees' claim does more. As explained previously, to resolve the fraudulent misrepresentation claim alleged in the present case, a court must identify and interpret substantive provisions of the 1985 closing agreement. Both McCandless and Voilas explicitly found that the fraud claims at issue did not require such interpretation. See Voilas, 170 F.3d at 378; McCandless, 50 F.3d at 232.

Moreover, the essence of the fraud claims in McCandless and Voilas is patently different from the claim alleged here. In McCandless we stated, "[t]he essence of the employees' [fraud] case is proof of justifiable reliance on the separate guarantees, not on the collective bargaining agreements." McCandless, 50 F.3d at 232; see also Voilas, 170 F.3d at 377 (finding this description applicable to the fraud claim at issue). By contrast, the essence of the present claim is that the employees were fraudulently denied their rights under of the 1985 closing agreement. Thus, the employees' claim implicates the underlying reason for section 301 preemption, namely, "the need for uniform interpretation of contract terms to aid both the negotiation and the administration of collective bargaining agreements." Antol v. Esposto, 100 F.3d 1111, 1115 (3d Cir. 1996) (citing Lucas Flour, 369 U.S. at 103–04). Accordingly, we conclude that it is preempted by section 301 of the LMRA.

2. Tortious Interference

The employees insist that their tortious interference claim does not call for analysis of the 1985 closing agreement, but instead simply requires a court to review a course of tortious conduct perpetrated by the appellees. We disagree.

Pennsylvania law requires a plaintiff to prove four elements in order to establish a claim of tortious interference with contractual relations:

> (1) the existence of a contractual relationship; (2) an intent on the part of the defendant to harm the plaintiff

14

by interfering with that contractual relationship; (3) the absence of a privilege or justification for such interference; and (4) damages resulting from the defendant's conduct.

Triffin v. Janssen, 626 A.2d 571, 574 (Pa. Super. 1993) (citations omitted).

To satisfy these requirements, the employees allege the following:

> P 78 — Plaintiffs believe, and therefore aver, that the Defendants acted intentionally and maliciously, for the express purpose of denying the Plaintiffs all of their contractual rights, including, seniority rights, flowing to the Plaintiffs pursuant to the terms of the 1985 closing agreement.
>
> P80 — Plaintiffs believe, and therefore aver, that Defendant Local 12, Defendant Jim Maley, and Defendant John Boisitz tortiously interfered with the enforcement of Plaintiff's 1985 closing agreement in order to protect seniority rights of production workers hired prior to April 8, 1996.
>
> P 81 — Plaintiffs believe, and therefore aver, that Defendant Philip M. DePietro, Jr., Defendant Stephen A. Banus and Defendant Local 773 intentionally and tortiously interfered with the Plaintiff's 1985 closing agreement by refusing to enforce the same and, by refusing to disclose the whereabouts of the same . ..
>
> P83 — Defendants, acting without privilege or license, wrongfully interfered with Plaintiffs' existing contractual relationships arising out of the 1985 closing agreement by inducing or otherwise causing Local 773 and Stroh's to breach their contractual obligations to Plaintiffs.
>
> P85 — Plaintiffs believe, and therefore aver, that as a result of the Defendants' reckless, willful and wanton actions and interfering with the Plaintiffs 1985 closing agreement, Plaintiffs have incurred and will continue to incur great harm and damages including, . . . , lost of reputation, loss of profits and good will, loss of career status, and loss of earning, benefits, bonuses and fringe benefits.

15

App., Tab 3 at 15-17 (emphasis added). Once again, these allegations clearly are "inextricably intertwined" with consideration of the terms of the 1985 closing agreement. For example, it is impossible to determine whether the appellees tortiously interfered by "refusing to enforce" the 1985 closing agreement without knowing what terms they were required to enforce and refused to do so. Similarly, a court cannot evaluate the veracity of the employees' claims that the appellees "intentionally and maliciously. . . den[ied] the Plaintiffs all of their contractual rights" and "wrongfully interfered with Plaintiffs' existing contractual relationships arising out of the 1985 agreement" without knowing to what rights and persons the employees are referring. In other words, "[t]he duties imposed and rights established through the state tort . . . derive from the rights and obligations established by the [collective bargaining] contract." Allis-Chalmers, 471 U.S. at 217. Thus, resolution of the employees' tortious interference claim will inevitably involve interpretation of the 1985 closing agreement, which mandates preemption by section 301. See Wilkes-Barre Publ'g Co. v. Newspaper Guild of Wilkes-Barre, 647 F.2d 372, 381-82 (3d Cir. 1981) ("where parties to a labor dispute are charged with tortious interference with a collective bargaining agreement, at least in the absence of outrageous or violent conduct, state law causes of action are preempted [by section 301]."

3. Civil Conspiracy

The employees' civil conspiracy claim suffers from the same defects as their claims of fraudulent misrepresentation and tortious interference.

Under Pennsylvania law, civil conspiracy is a "combination of two or more persons to do an unlawful act or criminal act or to do a lawful act by unlawful means or for an unlawful purpose." Ammlung v. City of Chester, 494 F.2d 811, 814 (3d Cir. 1974) (citing Landau v. Western Pennsylvania Nat'l Bank, 282 A.2d 335, 338 (Pa. 1971)).

In support of their claim, the employees allege:

> P89 - Plaintiffs believe, and therefore aver, that the Defendants, acting in concert and for common

16

> purposes and goals, agreed among themselves to commit an unlawful act or to do an otherwise unlawful [sic] act by unlawful means, namely, by conspiring to lie about the existence of the 1985 closing agreement and prevent the Plaintiffs from exercising those contractual rights arising thereunder.

App., Tab 3 at 18. Here, the appellees' "unlawful act" involves conspiring to prevent the employees from exercising their contractual rights under the 1985 closing agreement. Surely, to assess this claim a court will have to identify the rights that the appellees allegedly conspired to prevent. Therefore, because this claim is predicated upon the terms of the 1985 closing agreement, it is preempted by section 301.

In sum, to decide the merits of each claim alleged in the employees' complaint, a court would have to interpret the terms of the 1985 closing agreement to determine what rights, relationships or duties it conferred on the parties. The employees' contention that their state-law claims relate merely to the existence of the 1985 closing agreement is contradicted by the allegations in their own complaint. We take our cue from Allis-Chalmers, which explained "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended toflow from breaches of that agreement, must be resolved by reference to uniform federal law." Allis-Chalmers, 471 U.S. at 211. Accordingly, because the employees' claims derive from the 1985 closing agreement and "substantially depend upon" an analysis of its terms, we conclude that they are preempted by section 301 of the LMRA.

C.

Having determined that the employees' state-law claims are preempted by section 301 of the LMRA, we now must consider whether the District Court correctly held that the employees' complaint was barred by the statute of limitations. This question turns on whether the complaint constitutes a "hybrid" action.

A "hybrid" section 301 action is one in which a union member sues his or her employer for breaching its

17

contractual obligations under the collective bargaining agreement and the union for breaching its duty of fair representation. See DelCostello, 462 U.S. at 164-65; United Steelworkers of America v. Crown Cork & Seal Co., 32 F.3d 53, 58 (3d Cir. 1994). In DelCostello, the Supreme Court held that the six-month statue of limitations established in section 10(b) of the National Labor Relations Act, 29 U.S.C. S 160(b), applied to such actions. Id. at 170-71. The Court explained:

> In S 10(b) of the NLRA, Congress established a limitations period attuned to what it viewed as the proper balance between the national interest in stable bargaining relationships and finality of private settlements, and an employee's interest in setting aside what he views as an unjust settlement under the collective-bargaining system. That is precisely the balance at issue in this case. . . . Accordingly, `[t]he need for uniformity' among procedures followed for similar claims, as well as the clear congressional indication of the proper balance between the interests at stake, counsels the adoption of S 10(b) of the NLRA as the appropriate limitations period for lawsuits such as this.

Id. at 171 (quoting United Parcel Service v. Mitchell, 451 U.S. 56, 70-71 (1981) (opinion concurring in the judgment)).

Here, the District Court characterized the employees' action as follows:

> In this case, plaintiffs claims all arise from their contention that their bargaining representative and employer either agreed during collective bargaining to provide plaintiffs with certain seniority rights or fraudulently represented that they had done so. In this regard . . . defendants' characterization of plaintiffs' claims as a classic hybrid action is accurate. The gravamen of plaintiffs' complaint is that their employer is in breach of a collective-bargaining agreement, which was created in fact or by fraud and estoppel, and that the union defendants have breached their duty of fair representation by either failing to protect plaintiffs'

18

>    seniority rights or fraudulently misrepresenting the
>    substance of a collective-bargaining agreement.

Beidleman, 1998 WL 254979 at * 4. We agree with this characterization, and conclude that the employees' complaint is a hybrid section 301 action.5

Because the employees concede that they filed their complaint more than six months after their cause of action accrued, see Appendix, Tab 3 at 15 (Complaint P 74); Beidleman, 1998 WL 254979 at *3, n. 3, we find that the District Court correctly dismissed the employees' claims on statute of limitations grounds.

III.

The employees also challenge the District Court's March 11, 1998 order denying their motion to remand the case to state court. The employees contend that, "pursuant to the `well pleaded complaint rule,' there was nothing in [the] Complaint which would have indicated any basis for jurisdiction of the federal courts." Appellants' Brief at 29. However, our conclusion that the employees' state-law claims are completely preempted by section 301 is dispositive of the issues raised in the employees' motion to remand. See Caterpillar, 482 U.S. at 393 (1987) ("Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law . . . The complete pre-emption corollary to the well-pleaded complaint rule is applied primarily in cases raising claims pre-empted by S 301 of the LMRA") (internal citations omitted). Thus, the District Court properly denied the employees' motion to remand the case to state court.

_____

5. Indeed, even under the definition acknowledged by the employees, the complaint is a hybrid action. In their brief, the employees state: "the case
at bar does not, and could not, be converted to a hybrid action unless the averments of [the Complaint] would require the court to interpret and apply the substantive contents of a collective bargaining agreement." Appellants' Brief at 25 (emphasis added). This is precisely what we concluded in Part II.B.

19

IV.

For the foregoing reasons, we will affirm the District Court's order denying the employees' motion to remand and its order granting the appellees' joint motion to dismiss.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

20