790 F.2d 1279
 122 L.R.R.M. (BNA) 2297, 104 Lab.Cas. P 11,889
 Joseph SERRANO, et al., Plaintiffs-Appellants.
v.
JONES & LAUGHLIN STEEL CO., LTV Corporation,
Defendants-Third Party Plaintiffs-Appellees.
International Union, United Steelworkers of America,
AFL-CIO; Local No. 2163, United Steelworkers of
America, AFL-CIO-CLC, Third Party
Defendants-Appellees.
 No. 84-3992.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 10, 1986.
Decided May 8, 1986.
 
 Staughton Lynd (argued), Northeast Ohio Legal Services, Youngstown, Ohio, for plaintiffs-appellants.
 Willis J. Goldsmith (argued), Deborah Cranda, Jones, Day, Reavis & Pogue, Washington, D.C., Richard J. Brean, United Steelworkers of America, Pittsburgh, Pa., for defendants-third party plaintiffs-appellees.
 Before LIVELY, Chief Judge, WELLFORD, Circuit Judge, and PORTER, Senior District Judge.*
 LIVELY, Chief Judge.
 
 
 1
 The principal question presented by this appeal is whether the National Labor Relations Board (NLRB or Board) has exclusive jurisdiction over a dispute between individual employees and their employer arising out of an agreement between the employer and the employees' union. The agreement provided for concessions by the employees if the employer should decide to modernize an old facility. The district court held that three causes of action pled by the plaintiffs, claiming fraud by the employer, were preempted by federal labor law, and dismissed them. The court further held, with respect to two additional causes of action, that the plaintiffs failed to demonstrate the existence of genuine issues of material fact, and granted summary judgment in favor of the defendants.
 
 I.
 A.
 
 2
 Prior to 1981 Jones & Laughlin Steel Co. (J & L) was a major employer in Youngstown, Ohio. As this court has previously noted, a recession in the steel industry in the 1970s hit Youngstown particularly hard. See Local 1330, United Steel Workers v. United States Steel Corp., 631 F.2d 1264 (1980). In an effort to avoid a shutdown of J & L's Campbell Works coke plant, J & L and the United Steelworkers of America (the Union) negotiated and executed an agreement pertaining to rebuilding the coke batteries at the Campbell Works. The negotiations took place in June and July 1981, and the agreement was signed July 13, 1981. The agreement granted J & L the right to depart from the provisions of the basic collective bargaining agreement in certain matters of work practices, manning and scheduling. J & L was to be allowed to implement some of these concessions "[e]ffective as of the date that Management announces its determination to rebuild Campbell Works Coke Batteries." Other provisions of the agreement were not to take effect until the batteries were actually rebuilt.
 
 The preface of the agreement provides:
 
 3
 The Management of the Company is in the process of deciding whether or not the Coke Batteries and associated facilities of the By Product Coke Department at the Campbell Plant should be reconstructed. It is recognized by the Company and the Union that a decision to rebuild the concerned facilities would result in enhanced employment opportunities for many employees, and, as these employees leave the work force, job opportunities for laid off employees and/or for unemployed residents of the Youngstown Area. While it is recognized that the final decision as to whether or not to invest the monies required to rebuild the concerned facilities rests solely with Management, the local parties, without intending any limitation on Management's rights under the terms of the Labor Agreement, hereby agree to the following in an effort to make a rebuilt Coke Making and By Product operation efficient and economical, thereby encouraging Management to invest the monies required to rebuild these facilities at the Campbell Plant.
 
 
 4
 Sixteen numbered paragraphs follow the preface. Some deal with the concessions to be implemented when J & L announced its decision to rebuild and some with those to take effect only if the coke plant is actually rebuilt. Paragraph 15 gives management the right to use outside contractors for the entire rebuilding project. Paragraph 16 states:
 
 
 5
 The provisions of this Agreement shall be effective only if Management announces its determination to rebuild Campbell Works Coke Batteries. In the event such a project is not approved, the above provisions are void and will not be referred to by either party in any current or future issue.
 
 
 6
 The basic collective bargaining agreement referred to in the preface reserved solely to J & L the decision to close or discontinue a plant permanently.
 
 B.
 
 7
 The agreement was ratified by the union members at meetings on July 11 and 13. Local officials of J & L spoke with groups of workers at these meetings, urging ratification. Plaintiffs claim that the plant superintendent promised that if the Union accepted the concessions, the plant would remain open. On July 18 the board of directors of LTV Corporation, corporate parent of J & L, approved an expenditure of $151,000,000 to rebuild the Campbell Works Coke batteries. On July 22, 1981 LTV issued a press release that stated in part:
 
 
 8
 LTV ANNOUNCES PLANS FOR ADDITIONAL $315 MILLION IN STEEL CAPITAL
 
 
 9
 ... The first coke oven battery scheduled for rehabilitation at Youngstown, number 8 battery, will be in operation in 22 months. Number 7 coke oven battery will be in full production in 42 months.
 
 
 10
 The press release also quoted a statement by Thomas C. Graham, head of the LTV steel group and chief executive officer of J & L:
 
 
 11
 "The decision to rebuild the two Youngstown batteries was aided by a recently signed agreement with the local union of the United Steelworkers of America," Mr. Graham said. "The agreement will maximize the effective use of manpower on the batteries following the rebuild."
 
 
 12
 The concessions triggered by J & L's announcement of its intent to rebuild the coke plants were implemented. Between July 22, 1981 and January 1983 J & L spent approximately $12,000,000 to demolish and rebuild coke battery number 8. In November 1982 J & L notified the Union that it had decided to discontinue operation of the existing Campbell Works coke batteries by December 31, 1982. Thereafter, in accordance with requirements of the collective bargaining agreement, J & L advised the Union that it intended to close the Campbell Works coke plant permanently. Coke production ceased on February 4, 1983.
 
 
 13
 The Union filed a grievance, but pursued it through only three of the five steps provided for in the collective bargaining agreement. The grievance charged J & L with violating the July 1981 agreement as well as certain provisions of the underlying collective bargaining agreement. As relief the grievance demanded that J & L reopen the coke plant and abide by the July agreement or, in the alternative, make each affected employee whole for wages and benefits until his date of retirement at age 65. At the third stage of the grievance proceedings the Union charged that J & L had not intended to rebuild the Campbell Works coke batteries.
 
 II.
 A.
 
 14
 When the Union terminated the grievance without taking it to binding arbitration, 133 former J & L Campbell Works employees filed the present action in an Ohio court. Following removal to the United States District Court for the Northern District of Ohio, the plaintiffs filed a first amended complaint which set forth the five causes of action previously referred to. In the first three causes the plaintiffs charged J & L, respectively, with fraud in the announcement of the decision to rebuild the coke plant, fraud in the execution of the announced plan to rebuild, and fraud in negotiations with the Union at other coke plants. The fourth and fifth causes alleged negligent performance of contractual duties under the July agreement and breach of that agreement. The first four causes of action were presented as pendent state law claims. The plaintiffs asserted jurisdiction under section 301 of the Labor Management Relations Act, (1947, as amended, 29 U.S.C. Sec. 185 (1982), with respect to the fifth cause of action. The plaintiffs did not sue the Union. However, J & L did bring the Union in as a third-party defendant, alleging that if the plaintiffs should be found entitled to damages, the Union would be liable for any amount by which damages were increased by the Union's breach of its duty of fair representation.
 
 
 15
 The fraud claims were based on the assertion that, despite its unequivocal statements of intent to rebuild the coke plants, J & L actually intended to do so only if it could obtain an extension from the United States Environmental Protection Agency (EPA) of deadlines for bringing the Campbell Works into compliance with Clean Air Act requirements. Union representatives were told in November 1982 that J & L planned to close the Campbell Works. This was before the EPA made a final decision. On December 29, 1982 EPA denied J & L's application for a discretionary extension and less than one month later J & L announced its abandonment of plans to rebuild the plants. The fourth cause of action merely charged J & L with failure to exercise due care to perform all aspects of the July agreement and the fifth claimed that the decision to close the coke plants permanently violated the agreement.
 
 B.
 
 16
 The district court found that the plaintiffs had stated the first three causes of action as state fraud claims in an attempt to circumvent the exclusive jurisdiction of the NLRB. Referring to the guidelines set forth by the Supreme Court in San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the district court concluded that the conduct which the plaintiffs sought to have remedied under state law was arguably prohibited under the Labor Act as failure to bargain in good faith. This being so, the claims for relief from J & L's alleged misconduct were within the exclusive jurisdiction of the Board.
 
 
 17
 Clearly, the manifest underlying basis for the terms negotiated in the Memorandum of Agreement of July 13, 1981, was the continuation of coke operations at the Campbell plant. J & L bargained for and obtained concessions from the Union "to encourage Management to invest monies required to rebuild the facilities at the Campbell plant." Since the duty to bargain unquestionably extends beyond the period of contract negotiations, defendant had the duty to disclose any information they had concerning a shutdown of the Campbell plant as it related to the concessions made in the Memorandum of Agreement during the entire period of that agreement. Failure to make the disclosures would constitute a failure to bargain in good faith.
 
 
 18
 Thus, plaintiffs' claims in the first three causes of action that defendants failed to provide them with information relating to whether the Campbell plant would close while still taking advantage of the concessions negotiated in the Memorandum of Agreement involve conduct which is arguably prohibited under the NLRA.
 
 
 19
 District Court Memorandum Opinion, App. 86.
 
 
 20
 The district court recognized that plaintiffs were also claiming fraud in J & L's failure to disclose information about closing the Campbell Works or in misleading the Union as to their true intentions, aside from the understanding contained in the July agreement. However, the court found that this conduct, if proven, would be covered by the employer's duty to bargain about the effects of its decision to shut down the Campbell Works. Again, any failure to disclose or any affirmative misrepresentations about the decision arguably would be prohibited by the Labor Act as bad faith bargaining.
 
 
 21
 The district court granted summary judgment as to the fourth and fifth causes of action. The court found that the fourth cause of action, though pled as a state claim for negligent performance of a contract, was subject to the federal common law developed under section 301 of the Labor Act. Thus, it treated the fourth and fifth causes together as actions for breach of a labor contract. The court determined that the claimed breach of contract consisted of J & L's permanent closure of the Campbell Works. Since the July agreement unequivocally reserved to J & L the sole decision whether to close the plant, the district court found no genuine issue of material fact with respect to the alleged breach. The complaint was dismissed in its entirety. The district court also dismissed the third-party complaint against the Union as moot. The plaintiffs have appealed.
 
 III.
 
 22
 On appeal the plaintiffs argue that the fraud claims were not preempted "because the controversy presented under state law is not identical to that which could have been presented to the NLRB." They also maintain that even if these claims could have been presented to the NLRB, they came within an exception to the preemption doctrine as claims that "touch interests so deeply rooted in local feeling and responsibility that no Congressional intent to preempt can be inferred."
 
 
 23
 In San Diego Building Trades Council v. Garmon, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959), the Supreme Court stated that when it is not clear whether activity sought to be brought under state regulation is protected by section 7 of the Labor Act, or prohibited under section 8, or is outside the coverage of both sections, the Board rather than the courts must make the determination. The Court continued:
 
 
 24
 When an activity is arguably subject to Sec. 7 or Sec. 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.
 
 
 25
 Id. at 245, 79 S.Ct. at 780.
 
 
 26
 In Motor Coach Employees v. Lockridge, 403 U.S. 274, 285-91, 91 S.Ct. 1909, 1917-1920, 29 L.Ed.2d 473 (1971), the Court reviewed the reasons for application of the judicial doctrine of preemption in the area of labor law. Writing for the court, Justice Harlan summarized the rationale for preemption as follows:
 
 
 27
 The rationale for pre-emption, then, rests in large measure upon our determination that when it set down a federal labor policy Congress plainly meant to do more than simply to alter the then-prevailing substantive law. It sought as well to restructure fundamentally the processes for effectuating that policy, deliberately placing the responsibility for applying and developing this comprehensive legal system in the hands of an expert administrative body rather than the federalized judicial system. Thus, that a local court, while adjudicating a labor dispute also within the jurisdiction of the NLRB, may purport to apply legal rules identical to those prescribed in the federal Act or may eschew the authority to define or apply principles specifically developed to regulate labor relations does not mean that all relevant potential for debilitating conflict is absent.
 
 
 28
 Id. at 288-89, 91 S.Ct. at 1918-19 (footnote omitted).
 
 
 29
 Though the Court found that Lockridge presented a clear case for application of preemption under Garmon's "arguably protected by Sec. 7 or prohibited by Sec. 8 of the Act" guideline, the Court did set forth three exceptions to the Garmon rule. One of the exceptions is the basis of the plaintiffs' second argument--a situation where it cannot be presumed that Congress intended "to intrude so deeply into areas traditionally left to local law." Id. at 297, 91 S.Ct. at 1923.
 
 
 30
 The Court refined Garmon further in Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978). A state court enjoined peaceful picketing on Sears property that constituted a continuing trespass under California law. In upholding the injunction the Supreme Court noted that the matter which the state court sought to regulate was the location of the pickets, not the question of whether the picketing was protected activity. Id. at 187, 98 S.Ct. at 1752. Cautioning against a literal, mechanical application of Garmon, the Court prescribed a balancing approach when the activity sought to be subjected to state control is only arguably, as opposed to "clearly", subject to section 7 or 8 of the Labor Act. Id. at 187-88, 98 S.Ct. at 1752-53.
 
 
 31
 In "local interest" cases involving conduct arguably prohibited by section 8, two factors control the preemption decision. There must exist "a significant state interest in protecting the citizen from the challenged conduct." If this condition exists, even though the challenged conduct occurs in the course of a labor dispute, preemption is not required if state jurisdiction "entail[s] little risk of interference with the regulatory jurisdiction of the Labor Board. Although the arguable federal violation and the state tort [arise] in the same factual setting, the respective controversies presented to the state and federal forums would not [be] the same." Id. at 196-97, 98 S.Ct. at 1757 (footnote omitted). The next paragraph of the opinion refers to identical controversies, language which the plaintiffs have relied upon in their first argument:
 
 
 32
 The critical inquiry, therefore, is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to (as in Garner ) or different from (as in Farmer ) that which could have been, but was not, presented to the Labor Board. For it is only in the former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the Garmon doctrine was designed to avoid.
 
 
 33
 Id. at 197, 98 S.Ct. at 1757-58 (footnote omitted).
 
 
 34
 The Court concluded that the "primary jurisdiction" rationale for preemption was not sufficient to oust the state court of jurisdiction over the trespass action. The state court could determine that the location of the picketing violated state trespass laws without a significant risk of interference with the Board's uniform enforcement of the provisions of the Labor Act.
 
 
 35
 In Local 926, International Union of Operating Engineers v. Jones, 460 U.S. 669, 103 S.Ct. 1453, 75 L.Ed.2d 368 (1983), the Supreme Court reviewed its "approach to the pre-emption issue," as it had "stated and restated" it in earlier opinions:
 
 
 36
 First, we determine whether the conduct that the state seeks to regulate or to make the basis of liability is actually or arguably protected or prohibited by the NLRA. Garmon, supra, at 245; [79 S.Ct. at 779] see Sears, supra, at 187-190. [98 S.Ct. at 1752-1754] Although the "Garmon guidelines [are not to be applied] in a literal, mechanical fashion," Sears, supra, at 188, if the conduct at issue is arguably prohibited or protected otherwise applicable state law and procedures are ordinarily pre-empted. Farmer, supra, at 296. [97 S.Ct. at 1061] When, however, the conduct at issue is only a peripheral concern of the Act or touches on interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, it could not be inferred that Congress intended to deprive the State of the power to act, we refuse to invalidate state regulation or sanction of the conduct. Garmon, supra, at 243-244. [79 S.Ct. at 778-79] The question of whether regulation should be allowed because of the deeply rooted nature of the local interest involves a sensitive balancing of any harm to the regulatory scheme established by Congress, either in terms of negating the Board's exclusive jurisdiction or in terms of conflicting substantive rules, and the importance of the asserted cause of action to the State as a protection to its citizens.
 
 
 37
 Id. at 676, 103 S.Ct. at 1459 (citations and footnote omitted).
 
 
 38
 In Engineers v. Jones, the question was whether an action by a discharged employee against a union for tortious interference with his employment contract, and against the employer for breach of that contract, was preempted. The state court held that it had a deep and abiding interest in its citizens' contractual rights and that the tort action was so unrelated to the concerns of federal labor laws that the state action would not interfere with the administration of that law. After conducting the required balancing the Supreme Court disagreed, finding that the action affected arguably protected conduct. The Court emphasized the dual nature of preemption in the field of labor law. In addition to protecting "the exclusive jurisdiction of the Board over matters arguably within the reach of the Act," it requires "the substantive pre-emption by the federal labor law in the area to which it applies." Id. at 680, 103 S.Ct. at 1461. The Court concluded that the plaintiff's cause of action against the union for tortious interference with contractual relations was not of merely peripheral concern to federal labor policy.
 
 
 39
 More recently the Supreme Court has dealt with preemption in an unusual setting. In Belknap, Inc. v. Hale, 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983), Belknap hired replacement workers during a strike, promising them that they would not be discharged to accommodate returning workers at the end of the strike. The striking union brought unfair labor charges and Belknap filed counter-charges with the NLRB. As part of a settlement of all charges Belknap agreed to reinstate returning strikers. As a result of this agreement, Belknap laid off the replacements. When the lay-offs became final terminations the replacements sued Belknap in state court for misrepresentation and breach of contract. The Kentucky Court of Appeals reversed the trial court's entry of summary judgment for Belknap, holding that preemption was not required since the employer's activities were not an unfair labor practice and the misrepresentation and contract claims were of only peripheral concern to federal labor law, while deeply rooted in local law. The Supreme Court of the United States granted certiorari and affirmed.
 
 
 40
 The Supreme Court held that even though Belknap's offer of permanent employment to the replacements arguably would have been an unfair labor practice, the actions for fraud and breach of contract were not preempted. The controversy between Belknap and the replacements could not be said to be identical to that between Belknap and the strikers. The focus of the Board in determining whether Belknap had committed unfair labor practices as charged by the union "would be on whether the rights of strikers were being infringed.... The Board would be concerned with the impact of strikers not with whether the employer deceived replacements." Id. at 510, 103 S.Ct. at 3183. On the other hand, in the state court action, the focus would be on the rights of the replacements. The Court found that permitting the state action "would not interfere with the Board's determination of matters within its jurisdiction and that such an action is of no more than peripheral concern to the Board and the federal law. At the same time, Kentucky surely has a substantial interest in protecting its citizens from misrepresentations that have caused them grievous harm." Id. at 510-11, 103 S.Ct. at 3183. In addition, the Board could not have awarded relief to the replacements.
 
 IV.
 
 41
 The district court properly held that the three fraud claims concerned conduct arguably prohibited by the Labor Act. Section 8(d) requires an employer to bargain in good faith with respect to "wages, hours and other terms and conditions of employment," 29 U.S.C. Sec. 158(d). No matter how it is stated, the gravamen of the three fraud charges is that J & L did not bargain in good faith in obtaining concessions from the Union in the July agreement. To the extent that plaintiffs claim fraud unrelated to the July agreement, the same principles apply. The plaintiffs appear to argue that J & L fraudulently misled them after the agreement had been made in deciding to close the coke plants. This claim also implicates a section 8(d) duty. Though J & L retained the sole right to decide that the Campbell Works should be closed, it had a duty to bargain in good faith over the effects of that decision. First National Maintenance Corp. v. N.L.R.B., 452 U.S. 666, 677 n. 15, 101 S.Ct. 2573, 2580 n. 15, 69 L.Ed.2d 318 (1981). In an attempt to show that they are not pursuing an unfair labor practice claim, plaintiffs argue that J & L's conduct was not a refusal to bargain over the effects of a plant closure since the company complied with the requirement of the collective bargaining agreement that required 90 days notice in advance of the shutdown. Nevertheless, whether classified as a violation of the general duty to bargain in good faith or the more particular duty to bargain over the effects of a plant closure, the conduct about which plaintiffs are complaining was arguably a violation of section 8. This conduct is continuing to take advantage of the concessions without revealing the likelihood of a shutdown.
 
 
 42
 Failure of an employer to bargain in good faith about terms and conditions of employment is not peripheral to the concerns of federal labor law; rather, it strikes at the heart of one of the basic concerns of that law. Unless the fraud claims bring this case within an exception, the Garmon preemption doctrine applies. We do not believe this case comes within the exception relied upon by the plaintiffs. Preemption by federal law of these claims would not "intrude so deeply into areas traditionally left to local law" as to upset the traditional federal-state balance. Motor Coach Employees v. Lockridge, 403 U.S. at 297, 91 S.Ct. at 1923. The examples of such deep intrusion cited by the Court in Lockridge involved libel, Linn v. Plant Guard Workers, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), and mass picketing and threats of violence, United Automobile Workers v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958), both unprotected union activity. The alleged misconduct of J & L is not of the same order.
 
 
 43
 The plaintiffs argue that Belknap v. Hale supports their position. It is true that Belknap permitted a state court action for alleged employer misrepresentations to employees. However, Belknap is distinguishable on several grounds. Most importantly, the Court found that the strikers and the replacements had controversies with Belknap that were not identical. The NLRB could deal with the claims of the strikers, and the state court could deal with those of the replacements without infringing in any way upon the Board's exercise of its jurisdiction. "The interests of the Board and the NLRA, on the one hand, and the interest of the State in providing a remedy to its citizens for breach of contract, on the other, are 'discrete' concerns." 463 U.S. at 512, 103 S.Ct. at 3184 (citation omitted). Just as the controversies in Belknap were not identical, the Board could not provide a remedy to the replacements. Its treatment of the strikers' claims for back wages and restoration of benefits would not be affected by any relief in damages that the replacements might obtain in their state court action.
 
 
 44
 Applying the step-by-step process outlined in Engineers v. Jones, we have first determined that the conduct that the plaintiffs seek to have regulated under state law is arguably prohibited by the Labor Act. This being so, applicable state law and procedures ordinarily will be preempted. We also have determined that the conduct at issue is not "a mere peripheral concern of the Act." Since the plaintiffs assert that their claims involve interests so deeply rooted in local feeling and responsibility as to rule out any congressional intent to preempt state law, we are required to engage in a "sensitive balancing." 460 U.S. at 676, 103 S.Ct. at 1459.
 
 
 45
 When the proper balancing of interests is undertaken, it is clear to us that the concern with the substantive rights created and protected by federal law outweighs any interest the state might have in protecting its citizens from fraud and misrepresentations. There is only one group of employees in the present case and the conduct about which they complain deeply implicates employer-employee relationships. Since it is conceded that J & L cannot be required to reopen the Campbell Works, any remedy for J & L's conduct will involve back wages and continuation of benefits or compensation for the value of the concessions. These are precisely the forms of relief requested by the Union in its grievance. Unlike Belknap, this is not a case involving discrete controversies. In its essence the controversy presented to the court is identical to the one that could be presented to the NLRB in an unfair labor practice complaint. While the state has an interest in protecting its citizens from misrepresentations, we believe this interest is properly overriden by the need to enforce a uniform federal labor law.
 
 V.
 
 46
 Federal courts have jurisdiction under section 301 of the Labor Act over suits to enforce collective bargaining agreements. This is true even when the employer's conduct is arguably covered by section 7 or 8. Motor Coach Employees v. Lockridge, 403 U.S. at 298, 91 S.Ct. at 1923; Storey v. Local 327, International Brotherhood of Teamsters, 759 F.2d 517, 522 (6th Cir.1985). Thus, the district court properly did not apply the Garmon preemption tests to the fourth and fifth causes of action pled by the plaintiffs. Nevertheless, the district court granted summary judgment for J & L on both claims.
 
 A.
 
 47
 The plaintiffs contend that the fourth cause of action should have been treated as a separate tort claim and not "collapsed" into the fifth cause which admittedly was a breach of contract claim under section 301. The plaintiffs argue that the fourth cause set forth a separate claim for breach of the common law duty to perform a contract with ordinary care and skill. The district court adopted the reasoning of the court of appeals in Wilkes-Barre Publishing Co. v. Newspaper Guild of Wilkes-Barre, 647 F.2d 372 (3d Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1003, 71 L.Ed.2d 295 (1982). In Wilkes-Barre, the court held that district courts have jurisdiction under section 301 over claims for tortious interference with labor contracts and that federal common law controls. We believe the same reasoning applies to claims for negligent performance of a labor contract. The fourth and fifth causes of action both involve claims for violation of the terms of a collective bargaining agreement. The plaintiffs have not presented a tort claim that is independent of any section 301 contract claim. See Allis-Chalmers Corp. v. Lueck, --- U.S. ----, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), and Gibson v. A.T. & T. Technologies, 782 F.2d 686, 121 LRRM 2626 (7th Cir.1986).
 
 B.
 
 48
 The district court held that the July agreement, like the basic collective bargaining agreement, unambiguously reserved to J & L the sole right to determine whether to keep the Campbell Works open or to close them. The plaintiffs argued that the agreement reserved this right to J & L only until its decision on rebuilding the coke plants was announced. They contend on appeal that summary judgment was improper because they put forth a plausible interpretation of the agreement and thus created an issue of fact. They seek to rely on extrinsic evidence to support their interpretation, relying on this court's recent statement that "[t]he intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion." United Automobile Workers v. Yard-Man, Inc., 716 F.2d 1476, 1479 (6th Cir.1983), cert. denied, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). This statement was made in the context of the court's discussion of an agreement found to be ambiguous and after the court had stated that "the court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent." Id. Yard-Man did not change the rule stated by this court in Local 783, Allied Industrial Workers v. General Electric Co., 471 F.2d 751, 757 (6th Cir.), cert. denied, 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55 (1973):
 
 
 49
 It is true that there is generally broad latitude in the admissibility of bargaining history to construe a collective bargaining agreement. But where the meaning of the clause in question is clear, no construction is necessary.
 
 
 50
 We have examined the cases cited by the plaintiffs in support of their contention that J & L had somehow surrendered its clearly stated right to decide whether to cease operations at the Campbell Works and have found none of them persuasive. As this court stated in Local 1330, United Steelworkers v. United States Steel Corp., 631 F.2d 1264, 1280 (6th Cir.1980), there is no legal basis for this court's ordering an employer to continue operations which it has determined to discontinue for economic reasons. The plaintiffs do not dispute that the decision to close the Campbell Works was based on economic considerations. The July agreement not only failed to bind J & L to continue operations of the coke plant; it explicitly provided that J & L could determine whether to invest more money there to rebuild the plant and reserved to J & L the sole right to decide whether the plant would be closed. We believe the district court was correct in concluding that the memorandum in question, including its preface, reinforced and "expressly preserved defendants' unilateral right set forth in the basic Labor Agreement to close the Campbell plant." The plaintiffs presented no genuine issue of material fact with respect to the claim for breach of the July agreement.
 
 
 51
 The judgment of the district court is affirmed.
 
 
 52
 DAVID S. PORTER, Senior District Judge, dissenting in part.
 
 
 53
 We write separately to briefly express our dissent from Part V of the Court's well-reasoned opinion. While we agree that a Sec. 301 action is not available on these facts to force the defendants to keep the plant open, see, Textile Workers Union v. Darlington Manufacturing Corp. v. NLRB, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1983); Fraser v. Magic Chef-Food Giant Markets, Inc., 324 F.2d 853, 856 (6th Cir.1963), we think the majority overlooked plaintiffs' alternative request for relief.
 
 
 54
 In the complaint, plaintiffs' fourth claim for relief requests "... the value of concessions implemented by defendants during the period July 1981 to February 1983." We believe there is a genuine issue of material fact whether the memorandum of agreement permits the plaintiffs such relief. Certainly as a matter of fairness it would seem that defendants' implementation of concessions upon the "announcement" of its intention to keep the plant open, should obligate it to return the concessions in the event the plant is closed. In any case, we believe the contract is ambiguous on this point, and can only be interpreted with extrinsic evidence. See UAW v. Local 134 v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir.1983), cert. denied, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984).
 
 
 55
 Our reading of the record at least raises a question in our mind that the Memorandum of Agreement entitled plaintiffs the value of concessions arguably given in exchange for the continued operation of the plant. Typical of this point is the following paragraph which appeared in a July 1981 edition of Update, a Jones & Laughlin in-house publication.
 
 
 56
 "The decision to rebuild the two Youngstown batteries was aided by a recently signed agreement with the local union of the United Steelworkers of America," Mr. Graham said. "The agreement will maximize the effective use of manpower on the batteries following the rebuild."
 
 
 57
 Tr. at 119.
 
 
 58
 Also, the record contains copies of notes taken by company negotiators apparently during discussions concerning the proposed Agreement. One negotiator wrote the following:
 
 
 59
 Union knows we're looking at rehab--knows the big problem is the money. They may think either stringing alonglast year got agreement to cut crews to keep # 8 operating--then plant # 8 down anyway.
 
 
 60
 Tr. at 155.
 
 
 61
 The evidence is not explicit, but we think it is sufficient to create an issue of material fact that the Memorandum of Agreement entitles plaintiffs the value of concessions implemented upon the announcement of defendants' intention to rebuild the Campbell Coke Plant.
 
 
 
 *
 The Honorable David Porter, Senior Judge, United States District Court for the Southern District of Ohio, sitting by designation