REVISED MARCH 13, 2008

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 06-20865

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 15, 2008

Charles R. Fulbruge III
Clerk

E I DUPONT DE NEMOURS & CO

Plaintiff - Appellant

v.

GARY SAWYER

Defendant - Appellee

--------------------------------------------------------------------------------------------------------------

Cons. w/
No. 07-40574

GARY SAWYER; DOUG KEMPF; PETER BARNABA, SR;
GEOFF RORREV; TIM GREGORY; ET AL

Plaintiffs - Appellees

v.

E I DUPONT DE NEMOURS & CO

Defendant - Appellant

Appeals from the United States District Court
for the Southern District of Texas

Before KING, BARKSDALE, and DENNIS, Circuit Judges.

KING, Circuit Judge:

These appeals arise out of a dispute between E. I. du Pont de Nemours and Company ("DuPont") and former DuPont employees who allege that DuPont fraudulently induced them to terminate their employment and accept employment with a subsidiary that was later sold. In anticipation of a lawsuit from one of the employees, DuPont sought a declaratory judgment under the Employee Retirement Income Security Act ("ERISA"). The district court dismissed for lack of subject matter jurisdiction, concluding that the employee's potential claims could not be read as stating a claim under ERISA. DuPont filed notice of appeal.

A group of the former employees then sued DuPont, asserting state-law fraud and fraudulent inducement claims. DuPont filed two motions to dismiss, arguing that the employees' claims were preempted by the National Labor Relations Act ("NLRA") under the Garmon doctrine or, in the alternative, by ERISA. The district court denied both motions but certified an interlocutory appeal, which we accepted and consolidated with DuPont's appeal from the dismissal of its declaratory judgment action. For the reasons that follow, we conclude that the employees' state-law claims are not preempted by the NLRA or ERISA, and that DuPont's declaratory judgment action was properly dismissed for lack of subject matter jurisdiction. AFFIRMED.

I.

In early 2002, DuPont decided to separate a portion of its operations into a subsidiary, to be known as DuPont Textiles and Interiors, Inc. ("DTI"). Among the operations to be transferred to DTI was DuPont's Terathane Products unit, which was housed at the DuPont manufacturing facility in La Porte, Texas, along with a variety of other units that were not slated to become part of DTI. The employees at the La Porte plant were represented by Local 900C of the

International Chemical Workers Union Council, AFL-CIO, and covered by a single collective bargaining agreement (the "La Porte CBA").

In September and October 2002, DuPont and the union engaged in collective bargaining over the effects of the planned DTI separation on the La Porte plant. The most obvious consequence was that the number of DuPont job positions at the La Porte plant would be reduced when the Terathane Products unit was transferred to DTI. Since the La Porte CBA's seniority system gave employees with higher seniority the right to move to different units within the plant, there was the possibility that higher seniority Terathane Products employees might exercise this right in order to remain with DuPont when the Terathane Products unit was transferred to DTI. This would require DuPont to lay off lower seniority employees throughout the plant.

On October 24, 2002, DuPont and the union reached an agreement regarding the La Porte DTI separation. This agreement called for the formation of an independent collective bargaining unit for DTI employees at the La Porte plant. DTI employees would be covered by a separate collective bargaining agreement, which would start out as a "mirror image" of the La Porte CBA. DuPont stated that DTI would operate under DuPont compensation and benefits plans and policies. DuPont and the union also agreed on a plan whereby DuPont employees assigned to the Terathane Products unit would be given the opportunity to voluntarily transfer to DTI. For employees who chose to transfer, there would be a "seamless transition" with regard to all compensation and benefits programs, meaning that credit for things like service time and accrued vacation time would carry over to DTI. The voluntary transfer period was to begin on November 15, 2002, and run through December 16, 2002. During this time, Terathane Products employees could sign a form stating their desire to transfer from the DuPont La Porte bargaining unit to DTI and become members of the independent DTI bargaining unit. Once the transfer period ended,

DuPont and the union anticipated conducting another round of bargaining to determine how to deal with the situation created by Terathane Products employees who chose to stay at DuPont.

Ultimately, a high percentage of Terathane Products employees elected to transfer to DTI, and there was no need for a second round of bargaining. On January 23, 2003, DTI and the union signed the collective bargaining agreement (the "DTI CBA") for the separate DTI bargaining unit. In accordance with the earlier agreement of October 24, 2002, between DuPont and the union, the DTI CBA was a mirror image of the La Porte CBA, except for minor "cosmetic" changes reflecting that DTI, not DuPont, was the employer. As DuPont had promised, the compensation and benefits plans and policies for the new DTI employees were the same as they had been at DuPont.

Shortly thereafter, however, DuPont sold DTI to a subsidiary of Koch Industries, Inc. ("Koch"). Once the DTI employees were transferred to Koch, the terms of their employment became less favorable: they experienced losses with regard to wages, overtime, and retirement age, did not receive certain bonuses and stock options, and their benefits were reduced. One of the Terathane Products employees who had elected to transfer to DTI and wound up working for Koch was Gary Sawyer. Seeking to investigate the possibility of a lawsuit against DuPont based on its role in encouraging him to transfer to DTI, Sawyer filed a petition in Texas state court to conduct a deposition in anticipation of suit.[1]

DuPont responded to the petition for a pre-suit deposition by filing a declaratory judgment action in federal court against Sawyer. In the Southern District of Texas, DuPont sought a judgment that: (1) DuPont did not violate any fiduciary duties owed to Sawyer as the administrator of an ERISA plan; (2)

---

[1] Rule 202 of the Texas Rules of Civil Procedure allows a person to petition for a deposition in anticipation of suit if certain conditions are met.

Sawyer therefore has no right to individual relief under ERISA; (3) any of Sawyer's potential state-law claims are preempted by ERISA to the extent that they relate to an employee benefits plan; and (4) to the extent that Sawyer may allege non-preempted claims, DuPont violated no contractual, legal, or common law duty to Sawyer. The district court dismissed for lack of jurisdiction. It reasoned that Sawyer's potential claims against DuPont did not involve the interpretation of an ERISA policy, but rather focused on alleged misrepresentations by DuPont that induced Sawyer to leave DuPont for DTI, and therefore could not be read as stating a claim under ERISA.

Sawyer and a group of Terathane Products employees then sued DuPont in the Southern District of Texas, asserting fraud and fraudulent inducement. The employees' most recent complaint alleges that during the period of time in which they were employed by DuPont and contemplating the offer to transfer to DTI (i.e., after the October 24, 2002, agreement between DuPont and the union creating the voluntary transfer plan but before the transfer period closed on December 16, 2002), DuPont repeatedly assured them that DTI would not be sold to another entity, even though DuPont knew at the time that the sale of DTI was a possibility. According to the employees, they were assured that DTI would remain a part of the DuPont family. One DuPont manager responded to the employees' questions about the possible sale of DTI by explaining that "we're the whale, and fish don't eat whales." The employees' complaint further alleges that had the more senior employees chosen not to transfer to DTI, DuPont would have had to retrain them for new positions, the Terathane Products unit's operations would have been severely interrupted (presumably making DTI less attractive to Koch), and DuPont would have had to hire and train new employees for the Terathane Products positions.

DuPont filed two motions to dismiss. First, in a motion to dismiss for lack of subject matter jurisdiction, DuPont argued that the employees' claims were

based on communications that occurred in the context of collective bargaining, and are therefore preempted under the Garmon doctrine and lie within the exclusive jurisdiction of the National Labor Relations Board ("NLRB"). Next, in a motion to dismiss for failure to state a claim, DuPont argued that the employees' claims allege conduct in violation of certain provisions of ERISA and, consequently, are preempted by that statute. The district court denied both motions to dismiss but certified the case for interlocutory appeal. We accepted the case and consolidated it with DuPont's appeal from the dismissal of its declaratory judgment action.

## II.

We have jurisdiction under 28 U.S.C. § 1292(b) to review the interlocutory order of the district court denying DuPont's motions to dismiss the employees' complaint. The dismissal of DuPont's declaratory judgment action is a final judgment that we have jurisdiction to review pursuant to 28 U.S.C. § 1291.

For all of the issues raised in these appeals, our review is de novo. We review a dismissal for lack of subject matter jurisdiction de novo. Krim v. pcOrder.com, Inc., 402 F.3d 489, 494 (5th Cir. 2005). The same is true for interlocutory review of a denial of a motion to dismiss for lack of subject matter jurisdiction, Rico v. Flores, 481 F.3d 234, 238 (5th Cir. 2007), or failure to state a claim, In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007). Questions of federal preemption, including Garmon preemption and ERISA preemption, are reviewed de novo. Kaufman v. Allied Pilots Ass'n, 274 F.3d 197, 200 (5th Cir. 2001) (Garmon doctrine); Bullock v. Equitable Life Assurance Soc'y of the U.S., 259 F.3d 395, 399 (5th Cir. 2001) (ERISA).

## III.

DuPont first argues that the employees' fraud and fraudulent inducement claims are preempted under San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959). In Garmon, the Supreme Court held that "[w]hen an activity

6

is arguably subject to § 7 or § 8 of the [National Labor Relations] Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." Id. at 245. "[S]tate regulations and causes of action are presumptively preempted if they concern conduct that is actually or arguably either prohibited or protected by the Act." Belknap, Inc. v. Hale, 463 U.S. 491, 498 (1983) (citation omitted).

Thus, to determine whether the employees' claims are preempted under the Garmon doctrine, we must ask "whether the conduct at issue was arguably protected or prohibited by the NLRA." Int'l Longshoremen's Ass'n v. Davis, 476 U.S. 380, 394 (1986). The "critical inquiry" here is "whether the controversy presented under state law to the courts is identical to or different from that which could have been, but was not, presented to the National Labor Relations Board." Sheet Metal Workers Local Union No. 54 v. E.F. Etie Sheet Metal Co., 1 F.3d 1464, 1469–70 (5th Cir. 1993) (citing Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 197–98 (1978)). "That inquiry requires not only looking to the factual bases of each controversy, but also examining the interests protected by each claim and the relief requested." Id. at 1470 (citations omitted). The party claiming preemption, in this case DuPont, bears the burden of showing that the challenged conduct is arguably prohibited or protected by the NLRA. See Davis, 476 U.S. at 395.

DuPont contends that the employees' claims could have been presented to the NLRB because the conduct at issue—the alleged misrepresentations by DuPont concerning its intentions to sell DTI—is arguably prohibited by section 8 of the NLRA. Section 8 makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees" over certain mandatory subjects of bargaining, namely, "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(a)(5), (d); see NLRB v.

Katz, 369 U.S. 736, 742–43 (1962). An employer's decision to sell its business is not a mandatory subject of bargaining. NLRB v. New England Newspapers, Inc., 856 F.2d 409, 413 (1st Cir. 1988) (citing First Nat'l Maint. Corp. v. NLRB, 452 U.S. 666 (1981)). However, "the effects of that sale are considered 'conditions of employment' within the meaning of Section 8(d) of the Act, and thus are a mandatory subject . . . ." Id. (citing First Nat'l Maint., 452 U.S. at 680–82) (internal brackets and emphasis omitted). An employer therefore must engage in "effects bargaining" concerning the consequences of a sale. See id. at 411 n.2 (citing First Nat'l Maint., 452 U.S. at 681) ("'Effects bargaining' is bargaining related to the consequences of an employer closing or selling its place."). Relying on Riedel International d/b/a Willamette Tug & Barge Co., 300 N.L.R.B. 282 (1990), DuPont argues that the employees' complaint implicates this duty to engage in effects bargaining.

In Willamette, the union complained that the employer violated its effects bargaining obligations by only notifying the union of its decision to sell a division of its business on the day that the assets of the business were to be transferred to the buyer. Id. at 283–84. The NLRB found that the employer had violated section 8's effects bargaining requirement "by failing to notify the Union of the decision [to sell the division] until the day of the implementation of the decision, when it was virtually a fait accompli." Id. at 282. According to the NLRB, the union was entitled to "as much notice . . . as was needed for meaningful bargaining at a meaningful time." Id. at 283. The same-day notice given by the employer was "clearly insufficient." Id.

Willamette illustrates that there is an adequate notice component to the employer's section 8 duty to engage in effects bargaining. See also First Nat'l Maint., 452 U.S. at 681–82 ("[B]argaining over the effects of a decision must be conducted in a meaningful manner and at a meaningful time . . . ."). Accordingly, we have no doubt that whether DuPont provided the union with

sufficient notice of its decision to sell DTI so as to allow for meaningful effects bargaining is a question for the NLRB. But for preemption purposes, the "critical inquiry" is whether the controversy presented by the employees' state-law claims is identical to this or any other matter that could have been presented to the NLRB. Sheet Metal Workers, 1 F.3d at 1469–70 (citing Sears, 436 U.S. at 197–98). We conclude that it is not.

A section 8 claim arising out of DuPont's duty to give adequate notice of the DTI sale for effects bargaining purposes would be concerned with two key questions: when DuPont first notified the union of its decision to sell DTI and whether that notice allowed for meaningful effects bargaining at a meaningful time. The focus would be on DuPont's communications to and bargaining with the union. Strong federal labor interests relating to the employer–union relationship and the integrity of the collective bargaining process would be at stake in such a claim.

In contrast, the gravamen of the employees' complaint here is that DuPont fraudulently induced them to terminate their employment with DuPont and accept employment with DTI. The key questions are whether DuPont made affirmative misrepresentations to the employees concerning its intentions to sell DTI and whether the employees relied on those misrepresentations to their detriment in transferring to DTI. Unlike a section 8 claim, which would focus on the relationship between DuPont and the union, the state-law claims focus on the relationship between DuPont and individual employees. In particular, they focus on the direct communications made by DuPont to employees during the period of time when they were considering whether to transfer to DTI. Since this was an individual decision that each employee had to make on his own, independently of union decisionmaking or the collective bargaining process, the strong federal labor interests implicated by a section 8 claim are not present. Rather, it is the state's "substantial interest in protecting its citizens from

9

misrepresentations that have caused them grievous harm" that is at stake. Belknap, 463 U.S. at 511.

Furthermore, the employees complain of DuPont's conduct during the period of time when the employees were considering whether to transfer to DTI. The sale of DTI to Koch did not occur until several weeks, if not months, later.[2] Even if we were to ignore the fact that the employees complain of affirmative misrepresentations made to them directly by DuPont, and not merely of a failure on the part of DuPont to notify the union of the decision to sell DTI, DuPont has not shown that failing to notify the union during this time period constitutes conduct that is arguably prohibited by the NLRA. Compare Willamette, 300 N.L.R.B. at 282 (violation where notification was given on the day of the sale), with Chippewa Motor Freight, Inc., 261 N.L.R.B. 455, 459–60 (1982) (no violation where notification was given two days in advance of the closing of a freight terminal).

DuPont's attempt to bring the employees' state-law claims within the scope of the NLRA by arguing that the alleged misrepresentations "occurred in the overall course and context" of collective bargaining is unavailing. We recognize that DuPont and the union engaged in collective bargaining over the DTI separation plan, and that this bargaining led to the creation of the process by which the employees had the opportunity to voluntarily transfer to DTI. However, the employees make no allegations of misrepresentations on the part of DuPont that might have tainted or interfered with this bargaining.[3] Rather,

---

[2] It is not clear from the record when the sale of DTI actually occurred, but the voluntary transfer period ended on December 16, 2002, and there are indications that the employees were not administratively moved from DuPont to DTI until February 1, 2003, at the earliest, meaning that the sale would have had to occurred after that date.

[3] Nor does the record suggest that any such misrepresentations were made. DuPont did make a number of representations about what the compensation and benefits policies and plans would be at DTI. As we understand it, though, these representations all proved to be accurate. The only time that the subject of a possible DTI sale was broached during collective

they complain of communications from DuPont that occurred after the negotiations creating the voluntary transfer process were completed. At that point, each employee had a decision to make: stay with DuPont or transfer to DTI. It was toward this individual choice, and not any aspect of union decisionmaking or the collective bargaining process, that the alleged misrepresentations by DuPont were directed.[4]

The cases cited by the parties demonstrate the importance of this distinction and lend further support to our conclusion that the employees' claims are not preempted. DuPont relies upon several cases in which fraud claims were held to be preempted. However, these cases all involve misrepresentations that directly impacted the collective bargaining process. In Kolentus v. Avco Corp., 798 F.2d 949, 960 (7th Cir. 1986), for example, where the Seventh Circuit held that the conduct charged constituted an unfair labor practice under section 8(a)(5), the employees' complaint was that the employer committed fraud "at the time of negotiating and entering into the collective bargaining agreements." Here, though, the alleged misrepresentations occurred after the completion of the collective bargaining that established the voluntary transfer process.

Parker v. Connors Steel Co., 855 F.2d 1510 (11th Cir. 1988), is of no help to DuPont, either. In Parker, the employees alleged that their employer

_____

bargaining was apparently when the union proposed that DuPont "bridge" pensions in the event of a sale. Rather than disclaim the possibility of a sale, DuPont responded that all it could commit to was the language of the pension plan, and that this did not include a bridging provision.

[4] We see little relevance in the fact that DuPont and the union contemplated another round of bargaining after the voluntary transfer period ended (although this bargaining never actually occurred), or the fact that the "mirror image" DTI CBA was not finalized until after the employees had agreed to transfer to DTI. Regardless of what bargaining had occurred in the past or was foreseeable in the future, the bottom line is that the alleged misrepresentations were an attempt to influence an individual decision to be made by a number of DuPont employees (i.e., whether to stay at DuPont or transfer to DTI). That decision was not the subject of collective bargaining.

11

fraudulently obtained concession agreements by representing that it would keep a plant open if the concessions were granted. Id. at 1515. DuPont suggests that even though the agreements in Parker had already been negotiated by the union, subsequent misrepresentations that were made to the employees were still treated as having occurred during the collective bargaining process. This may be the case, but it does not follow that the misrepresentations made by DuPont also must be considered to have occurred during collective bargaining. The crucial distinction is that the employees in Parker were voting as union members to ratify concession agreements that would affect all union employees. See id. at 1514. They were not making individual decisions binding upon themselves only, as the DuPont employees were. Thus, though the misrepresentations in Parker may have been made directly to the employees, they nonetheless impacted the collective bargaining process because they were aimed at distorting the outcome of the ratification vote.[5] The same is true of Serrano v. Jones & Laughlin Steel Co., 790 F.2d 1279 (6th Cir. 1986).

More relevant to the case before us is the Third Circuit's decision in Voilas v. General Motors Corp., 170 F.3d 367 (3d Cir. 1999). There, the employees alleged that GM falsely represented that a plant would close in order to induce them to take an early retirement package. Id. at 371. Like the voluntary transfer plan offered to the DuPont employees, the early retirement package in Voilas was the product of collective bargaining between the employer and the union. Id. However, the misrepresentations were alleged to have occurred during the period when the early retirement option was available to

---

[5] We cannot accept DuPont's assertion that by agreeing to transfer to DTI, the employees were also "ratifying" the separation plan negotiated by the union and the DTI CBA. The voluntary transfer forms simply state that the employee "desire[s] to transfer from the DuPont LaPorte Bargaining Unit to DuPont Textile and Interiors (DTI), a wholly owned subsidiary of DuPont, and become a member of the DTI LaPorte Bargaining Unit." This is not a ratification vote.

employees—that is, after collective bargaining had been completed, when the employees were individually considering whether to take early retirement.[6] Id. at 372. The Third Circuit held that the employees' fraud claim was not preempted, reasoning that "the alleged fraud was not committed in connection with any part of the collective bargaining process nor does it touch and concern a mandatory duty on the part of the employer." Id. at 379. The court concluded: "Where . . . the claim is that the employer committed fraud in a direct communication to the employees on the subject of a plant closure, there is no NLRA preemption." Id. The same can be said with respect to DuPont's direct communications to its employees on the subject of the possible sale of DTI.

Our decision in Wells v. General Motors Corp., 881 F.2d 166 (5th Cir. 1989), is also instructive. In Wells, the employees alleged that GM made false inducements and representations to persuade them to accept an early retirement package. Id. at 169. We rejected GM's argument that the employees' claims could be construed as alleging conduct prohibited by section 8's good faith bargaining requirement, explaining that the alleged fraudulent inducement did not implicate national labor policy:

> [T]he challenged conduct . . . was not an attempt on the part of GM to interfere with the collective bargaining process or to diminish the union's representative role; instead, it was a post-bargaining effort to induce individual employees to accept [the early retirement package]. While not dispositive, it is relevant that the parties had completed collective bargaining over the [early retirement package]; GM's alleged inducements had no direct bearing upon the collective bargaining process in that they were not offered in order to obtain ratification of an agreement.

---

[6] Similarly, the misrepresentations in the case before us are alleged to have occurred during the period when the DuPont employees were individually considering whether to transfer to DTI.

Id. at 171 (footnotes omitted). Again, the same can be said here, as the conduct the employees complain of consists of post-bargaining efforts on the part of DuPont to induce them to voluntarily transfer to DTI, and had no direct bearing on the collective bargaining process.

Finally, we recognize that in establishing standards for when an employer must inform the union of the sale of its business for effects bargaining purposes, the NLRB has attempted to balance practical concerns relating to the employer's need for secrecy in its sale negotiations with the union's right to engage in meaningful effects bargaining. But we cannot accept DuPont's contention that allowing the employees' state-law claims to proceed will create conflicting standards on this issue and upset the balance struck by the NLRB. The employees do not complain that DuPont failed to disclose its plans for DTI to the union at the appropriate time. Rather, they complain of affirmative misrepresentations made to them individually when they were deciding whether to transfer to DTI. The fact that the NLRA allowed DuPont to remain silent about its plans to sell DTI until such time as necessary to allow for meaningful bargaining cannot be taken as providing a license for DuPont to make affirmative misrepresentations to its employees (who were, in effect, also prospective employees of DTI) up until that time had arrived. These are simply two different issues.[7]

In sum, the controversy presented by the employees' state-law claims is hardly identical to one which could have been brought before the NLRB. DuPont has not shown that the conduct that the employees complain of is arguably prohibited or protected by the NLRA. The employees' state-law claims are not preempted under Garmon.

---

[7] For the same reasons, to the extent that DuPont argues that the misrepresentations alleged by the employees constitute conduct that is arguably protected by the NLRA, we disagree.

IV.

DuPont next argues that the allegations made in support of the employees' state-law claims are sufficient to state a claim under ERISA and are therefore preempted by that statute. There are two types of ERISA preemption. First, ERISA's express preemption clause states that with certain exceptions, ERISA "shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C. § 1144(a).

Second, ERISA's civil enforcement provision, 29 U.S.C. § 1132(a), "'set[s] forth a comprehensive civil enforcement scheme'" that "'would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA.'" AETNA Health Inc. v. Davila, 542 U.S. 200, 208–09 (2004) (quoting Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54 (1987)). Accordingly, "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." Id. at 209 (citing Pilot Life, 481 U.S. at 54–56; Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 143–45 (1990)). DuPont argues for preemption under this theory when it contends that the employees' state-law claims could have been brought under ERISA.

Specifically, DuPont points out that it had two roles with respect to the employees: it was both their employer and the administrator of their employee benefits plan, which was protected by ERISA. The employees, in turn, were not only employees but also the beneficiaries of an ERISA plan. And since the Supreme Court has held, in Varity Corp. v. Howe, 516 U.S. 489, 492 (1996), that ERISA's civil enforcement provision authorizes beneficiaries of an ERISA plan to bring a lawsuit seeking individual relief against the plan administrator for

breach of fiduciary duty, DuPont argues that the employees should have brought such a suit.

In Varity, a group of beneficiaries of a firm's ERISA plan sued the plan administrator, who was also their employer, claiming that the administrator, through trickery, led them to withdraw from the plan and to forfeit their benefits. 516 U.S. at 491–92. The plaintiffs in Varity were employees of Massey-Ferguson, a subsidiary of Varity Corporation, and participants in Massey-Ferguson's self-administered ERISA benefits plan. Id. at 492. Varity devised a plan to transfer some of Massey-Ferguson's money-losing divisions to a new subsidiary, with the expectation that the subsidiary would fail, and thus eliminate various obligations—including those relating to the ERISA plan—that Varity planned to transfer to the subsidiary. Id. at 493. At a special meeting called to persuade the employees to accept these changes, Varity misrepresented the new subsidiary's financial viability in an attempt to convince the employees that their benefits would be secure under the subsidiary. Id. at 493–94. After the employees agreed to the transfer, the subsidiary failed, as Varity had anticipated, and the employees' benefits were lost. Id. at 494. The employees then sued under ERISA, seeking reinstatement in the plan they had withdrawn from. Id. at 492. The Supreme Court held that Varity had been acting in its capacity as a plan administrator and was thus susceptible to suit under ERISA's civil enforcement provision. Id. at 501, 507.

Crucial to the question whether the employees in this case could have brought a Varity-type suit, then, is whether their claims relate to DuPont's role as administrator of an ERISA plan or simply to its role as employer. DuPont argues for the former, and in favor of preemption, on the grounds that the employees' contentions are "very similar, if not substantively identical," to those that stated a claim for breach of fiduciary duty under ERISA in Varity. We disagree. In Varity, the misrepresentations at issue were entirely bound up with

communications regarding the ERISA plan. Varity called a special meeting that, "to a considerable extent, was about benefits," presented a variety of detailed information about the benefits that the employees currently enjoyed and the benefits that would be available under the new subsidiary, and "intentionally connected its statements about [the subsidiary's] financial health to statements it made about the future of benefits, so that its intended communication about the security of benefits was rendered materially misleading." Id. at 501, 505 (emphasis removed). Not surprisingly, the Supreme Court held that "making intentional representations about the future of plan benefits in that context is an act of plan administration." Id. at 505.

In contrast, the misrepresentations that the employees complain of in this case do not appear to have occurred in the context of plan administration. DuPont held a series of meetings to discuss the DTI separation plan, but there is no indication that these meetings were, "to a considerable extent, . . . about benefits," as the meetings in Varity were.[8] See id. at 501. There was apparently one meeting at which DuPont produced a specialist who discussed benefits, but the employees do not allege that the misrepresentations about the future of DTI were made by this individual,[9] or even that the misrepresentations were specifically connected to this individual's presentation so as to bolster the

---

[8] In fact, there were a variety of issues unrelated to benefits that were raised by the DTI separation and required communications from DuPont, such as the voluntary transfer process negotiated by DuPont and the union, the status of the new DTI collective bargaining unit, matters relating to compensation and working conditions at DTI, and the transfer of seniority rights.

[9] This individual is described in the employees' complaint as "a specialist from Boulder, Colorado." There are no indications that the specialist made any representations about DuPont's plans to sell DTI, or was even in a position to know about those plans. Cf. Varity, 516 U.S. at 503 (misrepresentations about the financial viability of the subsidiary came from a Varity vice-president who also had authority to communicate (and did in fact communicate) to employees about ERISA-plan matters). Moreover, the representations that were made about benefits all proved to be true—the benefits under DTI were the same as they had been under DuPont, as promised.

statements about benefits. Rather, the employees allege that misrepresentations were made by DuPont management and officers in response to concerns and questions that were raised by the employees themselves. The clear nexus that existed in Varity between the alleged misrepresentations and an act of plan administration is lacking here, and we fail to see how the employees could have brought suit under ERISA, or how their claims threaten to duplicate or supplant an ERISA remedy. Accordingly, the employees' claims are not preempted by ERISA's civil enforcement provision.

Still, there remains the possibility that the employees' claims may be preempted by ERISA's express preemption clause,[10] which states that ERISA "shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C. § 1144(a) (with certain exceptions that are inapplicable here). The Supreme Court has "observed repeatedly that this broadly worded provision is 'clearly expansive.'" Egelhoff v. Egelhoff, 532 U.S. 141, 146 (2001) (quoting N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655 (1995)). But at the same time, the Court has "recognized that the term 'relate to' cannot be taken 'to extend to the furthest stretches of its indeterminancy,' or else 'for all practical purposes pre-emption would never run its course.'" Id. (quoting Travelers, 514 U.S. at 655). In determining whether a state law is preempted, therefore, the Court has indicated that we are to "look both to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on ERISA plans." Id. (internal quotation marks and citations omitted).

In enacting ERISA, Congress's objectives were to

---

[10] Although, as we have previously observed, the "set of claims described by [ERISA's civil enforcement provision] will rarely, if ever, differ from the set of claims that 'relate to' an ERISA plan under [ERISA's express preemption clause]." Woods v. Tex. Aggregates, L.L.C., 459 F.3d 600, 603 (5th Cir. 2006).

> protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b). In light of these objectives, we apply a two-part test when a defendant argues that a claim is preempted by ERISA. The defendant must prove that: "(1) the claim 'addresses an area of exclusive federal concern, such as the right to receive benefits under the terms of the Plan; and (2) the claim directly affects the relationship among traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries.'" Bank of Louisiana v. AETNA U.S. Healthcare Inc., 468 F.3d 237, 242 (5th Cir. 2006) (quoting Mayeaux v. La. Health Serv. & Indem. Co., 376 F.3d 420, 432 (5th Cir. 2004)).

We see little danger that the employees' claims will intrude upon an area of exclusive federal concern. If the employees were claiming that they were wrongfully denied benefits due to them under the terms of the DuPont or DTI ERISA plan, or that either plan was improperly administered, this element would be implicated. See id. (claims that require inquiry into the administration of an ERISA plan implicate an area of exclusive federal concern); Hubbard v. Blue Cross & Blue Shield Ass'n, 42 F.3d 942, 946 (5th Cir. 1995) (same for suit alleging improper processing of a claim for benefits under an ERISA plan). But the heart of the employees' complaint is that DuPont fraudulently induced them to terminate their employment with DuPont and accept employment with DTI. To prevail, the employees need not prove that any aspect of DuPont's administration of the employees' ERISA plan was improper. The claims only

relate to misrepresentations that DuPont is alleged to have made about its intentions to sell DTI. They simply do not intrude into federal matters respecting the duties and standards of conduct for an ERISA plan administrator.

With regard to the second element of the preemption test, DuPont points out that the employees' claims necessarily involve traditional ERISA entities—DuPont was both the employer and plan administrator, and the employees were plan participants and beneficiaries. However, "[f]or purposes of ERISA preemption the critical distinction is not whether the parties to a claim are traditional ERISA entities in some capacity, but instead whether the relevant state law affects an aspect of the relationship that is comprehensively regulated by ERISA." Bank of Louisiana, 468 F.3d at 243. "The critical determination is whether the claim itself created a relationship between the plaintiff and defendant that is so intertwined with an ERISA plan that it cannot be separated." Id. (internal quotation marks, brackets, and citation omitted). Here, the employees' allegation that DuPont fraudulently induced them to transfer to DTI does not affect an area of their relationship that is comprehensively regulated by ERISA. As we have discussed above, the employees are not claiming that DuPont improperly administered an ERISA plan; litigation of their claims will not intrude into these matters. We also doubt that the employees' claims will require inquiry into the terms of an ERISA plan, except perhaps to calculate damages.[11] In sum, DuPont has not shown that the employees' claims "relate to" an ERISA plan for purposes of ERISA's express preemption clause.

---

[11] The fact that the employees have pled, as one element of their damages, that they suffered losses with regard to benefits after the DTI sale does not require a finding of preemption. We have rejected the argument that "any lawsuit in which reference to a benefit plan is necessary to compute plaintiff's damages is preempted by ERISA . . . ." Rozzell v. Security Servs., Inc., 38 F.3d 819, 822 (5th Cir. 1994).

V.

Finally, we turn to DuPont's argument that dismissal of its declaratory judgment action against Sawyer for lack of subject matter jurisdiction was error. In its declaratory judgment complaint, DuPont alleged the existence of federal question jurisdiction on the basis that the case arose under ERISA. Among other things, DuPont sought a judgment that it did not violate any fiduciary duties it owed as an administrator of an ERISA plan, Sawyer has no right to individual relief under ERISA, and Sawyer's potential state-law claims are preempted by ERISA.

"Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the District Court." Pub. Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 248 (1952). Thus, our task is to analyze the character of the "threatened action" against DuPont; if this hypothetical action arises under ERISA and thus states a federal question, subject matter jurisdiction exists over the declaratory judgment action.

There is no need for much discussion here, given our conclusion in the consolidated appeal that the employees' claims are not preempted by ERISA's civil enforcement provision. Just as these claims are not an ERISA action in disguise, the threatened suit that DuPont sought to defuse with a declaratory judgment was not an ERISA action. Accordingly, subject matter jurisdiction over the declaratory judgment action is lacking.

VI.

For the foregoing reasons, we AFFIRM the interlocutory order denying DuPont's motions to dismiss the employees' claims, and AFFIRM the dismissal of DuPont's declaratory judgment action.